985 So.2d 1059 (2008)
Anthony SPANN, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1334.
Supreme Court of Florida.
July 3, 2008.
*1062 Baya Harrison, III, Monticello, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from an order of the circuit court denying a motion to vacate a conviction for first-degree murder and a sentence of death filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the circuit court's order denying postconviction relief.

FACTS AND PROCEDURAL HISTORY
Anthony Spann was charged with and convicted of conspiracy to commit robbery with a deadly weapon, carjacking with a deadly weapon, kidnapping, robbery with a deadly weapon, grand theft, and the first-degree murder of Kazue Perron. Spann was sentenced to death for his participation in the crimes. On direct appeal, we summarized the facts of the crime as follows. On November 13, 1997, Anthony Spann drove his blue Subaru as the getaway car for the robbery of a pawn shop. Leonard Philmore and Sophia Hutchins robbed the pawn shop. They took handguns and jewelry, but little or no money. That evening, Spann, Philmore, and two women, Keyontra Cooper and Toya Stevenson, spent the night in a local motel. The next morning, on November 14, 1997, while the four were still at the motel, Cooper's friend paged her to tell her that the police were looking for Philmore. Spann and Philmore decided to leave town and planned to rob a bank for the money to do so. They planned to use the Subaru as the getaway car from the bank robbery. Since they assumed the police would be looking for the Subaru, they planned to carjack a different vehicle to use as transportation to leave town. They specifically targeted a woman for the carjacking to make it easier. They planned to kill her so that she could not identify them later.
At about noon, Spann and Philmore took Cooper and Stevenson home to get ready to leave town. Spann and Philmore went to a shopping mall to search for a victim. When their attempts failed, they went to what Spann described as "a nice neighborhood" where they spotted a gold Lexus with a woman driver. They followed her to a residence. When she pulled into the driveway, Philmore approached her, asked to use her cell phone, and then forced her back into the car at gunpoint. Philmore rode in the Lexus with the victim, Kazue Perron, and Spann followed in the Subaru. The victim was nervous and crying. She offered Philmore her jewelry, which he took and then later threw away because he was afraid it would get him in trouble. They drove down an isolated road, and when they stopped, Spann motioned to Philmore, a motion that Philmore understood to mean that he should kill the woman. Philmore told the victim to go to the edge of a canal, but according to him, the woman instead came toward him. Philmore testified that he shot her in the forehead using a gun he had stolen the day before from the pawn shop. Philmore picked up the victim's body and threw it into the canal, and in the process got blood on his shirt.
Philmore and Spann left together in the Subaru to rob a bank. In the car, Philmore *1063 took off his bloody T-shirt, which was later recovered by police, and put on Spann's T-shirt. Philmore went into the bank, grabbed approximately one thousand dollars cash from the hand of a customer at the counter, and got back into the passenger's side of the blue Subaru. As planned, Spann and Philmore abandoned the Subaru and picked up the Lexus. They then went to pick up Cooper and Stevenson. Stevenson testified that Spann and Philmore picked her up in the Lexus between 2:30 and 3:00 that afternoon. They picked up Cooper, then headed back to Sophia Hutchins' house. Stevenson and Cooper questioned Philmore and Spann about the car; they were told not to worry about it.
Before they reached Hutchins' house, at around 3:15 p.m., Officer Willie Smith, who was working undercover for the West Palm Beach Police Department, saw Spann driving the gold Lexus. Smith knew Spann had an outstanding warrant so he signaled surveillance officers, who began to pursue him. Spann tried to outrun the police and a chase ensued through a residential area. They drove onto the interstate, and the police lost them. Eventually the Lexus blew a tire and went off the road at the county line. A motorcyclist saw the Lexus drive off the road and saw four people get out and run into an orange grove. The motorcyclist called 911 on his cell phone. The grove owner saw people come into the grove from the road and later identified one of the men as Spann. The grove owner heard a helicopter overhead and saw that the men had guns. He told them to hide in the creek brush, and he then called 911. The grove owner met troopers by the road and helped them search for Spann and the others. Six hours after the manhunt began, Spann, Philmore, Cooper and Stevenson were found in the grove. Days later, the grove owner found a gun and beeper in the water near the creek brush where the four were hiding. Police recovered a second gun in the same water.
Spann and Philmore were both indicted on the charge of first-degree murder, but their trials were severed. Spann was also indicted for the crimes of conspiracy to commit robbery with a deadly weapon, carjacking with a deadly weapon, kidnapping, robbery with a deadly weapon, and grand theft. Philmore was tried first and convicted of first-degree murder. Before his penalty phase, Philmore testified for the State against Spann. Philmore was eventually sentenced to death and the conviction and sentence were affirmed on appeal. Philmore v. State, 820 So.2d 919 (Fla.2002). As for Spann, the jury returned verdicts of guilty on all counts, including the first-degree murder of Kazue Perron. Spann waived both the presentation of mitigating evidence and a jury advisory recommendation. The trial court conducted hearings on these matters, found that Spann's decision was made knowingly and intelligently, and discharged the jury. Defense counsel proffered evidence in mitigation, and the State presented three witnesses in support of certain aggravating circumstances. The parties filed sentencing memoranda, and the trial court conducted a Spencer[1] hearing. The trial court then sentenced Spann to death for first-degree murder; fifteen years for conspiracy to commit robbery with a deadly weapon; life for carjacking; life for kidnapping; life for robbery with a deadly weapon; and five years for grand theft.
On direct appeal, Spann raised seven *1064 issues.[2] This Court rejected Spann's arguments on all claims and affirmed his conviction and sentence of death. See Spann v. State, 857 So.2d 845 (Fla.2003). On August 2, 2004, Spann filed an initial motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. Spann filed an amended motion on October 20, 2004. After a Huff[3] hearing, the trial court summarily denied certain claims, but granted an evidentiary hearing on other claims. On January 3, 2005, Spann filed a second amended motion for postconviction relief, and on March 14, 2005, he filed a motion to amend his second amended motion. The trial court granted the motion. After an evidentiary hearing, the trial court issued an order denying all of Spann's claims. This appeal followed.

RULE 3.851 APPEAL
Spann appeals the denial of postconviction relief, raising two issues. He contends that (1) trial counsel rendered ineffective assistance during the guilt phase of trial, and (2) trial counsel rendered ineffective assistance during the penalty phase by failing to conduct a thorough investigation of mitigating evidence.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (affirming the Strickland two-prong analysis for claims of ineffective assistance of counsel). As to the first prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052; see also Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995). For the second prong, the reviewing court must determine whether there is a reasonable probability that, but for the deficiency, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. 2052.
Generally, this Court's standard of review following a denial of a postconviction claim where the trial court has conducted an evidentiary hearing accords deference to the trial court's factual findings. *1065 McLin v. State, 827 So.2d 948, 954 n. 4 (Fla.2002). "As long as the trial court's findings are supported by competent substantial evidence, `this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997) (quoting Demps v. State, 462 So.2d 1074, 1075 (Fla.1984)). However, the circuit court's legal conclusions are reviewed de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).

Ineffective Assistance of Counsel During Guilt Phase

Failure to Present Alibi Witness
Spann contends that counsel was ineffective for failing to present the testimony of Spann's brother, Leo Spann. Spann asserts that Leo would have corroborated Spann's statement to the police that Spann was at the house of his aunt, Mrs. Willie Alma Brown, in West Palm Beach at the time of Kazue Perron's abduction and murder in Indiantown. Spann further argues that he was prejudiced by this failure because the testimony of his codefendant, Leonard Philmore, was the only evidence to show that Spann was involved in the abduction and murder of Perron.
The trial court denied relief and concluded that Leo's statements concerning Spann's alibi were contradicted by evidence presented at trial and also in conflict with Spann's own statement. As a result, Spann failed to show prejudice under Strickland. We agree. At trial, the State introduced into evidence a tape of Spann's statement to the police. In his statement, Spann claimed that on the day of the crime, after he, Philmore, Stevenson, and Cooper left the motel where they spent the night, he and Philmore dropped Stevenson and Cooper at their respective homes, and then went to see Sophia Hutchins. Spann said he left Hutchins' house alone and drove to his aunt's house in his blue Subaru. He indicated that no one saw him while he was at his aunt's house. He was there for about an hour before Philmore came by in a white Lexus between 12 and 1 p.m. to pick him up.
Leo Spann testified concerning Spann's whereabouts on the day of the crime at his deposition and at the evidentiary hearing. In his deposition, Leo stated that he saw Spann come home around 2 to 3 p.m. and never saw Spann leave. However, on cross-examination he said Spann could have come home an hour earlier or an hour later. He also said he did not see Philmore at his aunt's house that day. At the evidentiary hearing, Leo testified that he knew Spann was in the small house in the back of the aunt's house sometime between 9 and 10 a.m. because the lights were on in the house. The next time he was aware that Spann was on the property was between 1 and 2 p.m.[4] Leo said that he heard the gate in front of the house squeak open about ten to fifteen minutes later. Around 2 p.m., he looked outside and noticed that there was a car parked close to the house and it looked like either a gold Lexus or Acura. Leo further testified that he did not see Philmore at the house that day.
A comparison of Spann's statement and Leo's testimony demonstrates that the two statements were not consistent with regards to Spann's whereabouts on the day of the crime. Spann admitted he was at a hotel with Philmore and two females on the morning in question, but Leo said Spann was in the house behind the aunt's *1066 house during the same time period. While Spann stated that he was home for about an hour before Philmore came to pick him up and that Philmore picked him up sometime between 12 and 1 p.m., Leo said several times at his deposition that he saw Spann come home between 2 and 3 p.m. Moreover, Leo testified that he never saw Spann leave and never saw Philmore at the house. The presentation of this type of contradictory evidence would have weakened Spann's alibi defense. Counsel cannot be deemed ineffective for not calling an alibi witness who would not have been helpful. See Happ v. State, 922 So.2d 182 (Fla.2005) (finding that counsel was not ineffective for failing to call an alibi witness because the witness's deposition revealed that it was in direct conflict with another witness's alibi testimony).
Spann further contends that Leo's alibi testimony was critical because there were no eyewitnesses to the shooting of Perron other than Philmore, who was a self-interested codefendant, and no one identified Spann as participating in the bank robbery. However, a review of the record demonstrates that Leo's testimony is contradicted by other evidence presented at trial that cumulatively demonstrates that Spann was involved in the abduction and murder of Perron as well as the bank robbery in Indiantown.
In addition to Philmore's testimony, which included Spann in both the planning and execution of the criminal activities, there were several witnesses who placed Spann in the area where the victim was kidnapped and placed Spann with Philmore during the time of the robbery and the murder. Spann himself, Philmore, Cooper, and Stevenson said they spent the night of November 13 at a motel together. Around noon, Spann and Philmore took Cooper and Stevenson home. There was testimony from persons in the victim's neighborhood who placed an old blue car [Spann had a blue Subaru][5] in the vicinity around 1 p.m. The car was also seen leaving the scene of the bank robbery just before 2 p.m. At or near 2:30 p.m., Spann and Philmore picked up Stevenson at her home, and they picked up Cooper shortly thereafter. They were driving the stolen Lexus. Around 3:30 p.m., the four attempted to flee the police, a tire on the Lexus blew out, and the four were eventually arrested after several hours of a police search.
Because all of Leo's statements are either inconsistent with Spann's alibi, in contradiction with other evidence presented at trial, or simply do not support Spann's alibi that Spann was home during the time period of the crimes, there is not a reasonable probability that the outcome would have been different had counsel presented Leo's alibi testimony. Accordingly, Spann fails to demonstrate that counsel was ineffective under Strickland.

Failure to Challenge Mrs. Brown's Testimony
Spann also contends counsel was ineffective for failing to challenge Mrs. Brown's videotaped testimony by showing that she had memory problems. While it is clear that Brown has some type of memory problem, Spann has failed to demonstrate any prejudice based on this fact. During her direct examination, Brown said Spann was not living in the house behind her home. However, on cross-examination, she admitted that Spann could have been living there without her knowledge. When asked whether Spann stayed at her house or visited her on the day of the crime, she responded, "Not that I know, sir." Subsequently, during cross-examination, defense counsel questioned Brown's *1067 knowledge of the little house in the back part of her property. When defense counsel asked Brown whether Spann was living in that little house behind her house, she responded, "No, he sure wasn't. If he was back there, I did not know it." When asked again whether she knew if he was living in the little house, she again testified, "No, I don't know it." Brown also admitted that somebody could come through the gate in front of her house and go around the side of her house to the little house in the back, and she would not know. However, on redirect, Brown testified that she never leaves her house and usually sits on her porch outside the house all day, and that during the month of November 1997, she never saw Spann coming in and out of the backyard.
In addition, defense counsel testified that he did not need to establish that Brown was senile or suffering from dementia because she could not say one way or the other whether Spann was on the property on November 14. Counsel believed that her testimony did not foreclose Spann's alibi, especially considering her admission that, despite her testimony that she was on the porch outside her house, someone could be on the property without her knowledge.
We find that counsel was not deficient because a review of counsel's cross-examination of Brown demonstrates that counsel made an effort to neutralize Brown's testimony by showing that Brown did not know whether Spann was living in the back part of the property or whether Spann was home at any time on the day of the crimes. Thus, counsel indirectly proved that Brown did have a memory problem. Conducting a medical follow-up would have done nothing more than reiterate the point that Spann could have been on the property on the day of the crime without Brown's knowledge, a point that was in fact made.
Spann also asserts that the prosecutor improperly bolstered Brown's testimony during closing arguments by comparing her to his late grandmother who never forgot or missed anything that occurred in the neighborhood because she was always sitting on her front porch. Spann argues that in light of counsel's failure to present Leo's alibi testimony, the prosecutor's statement prejudiced the outcome of the guilt phase. The trial court found the prosecutor's argument to be fair comment because the defense made Spann's whereabouts an issue in closing argument by arguing that Spann was at Brown's house at the time of Perron's murder. The trial court further found that the comment did not amount to improper bolstering because taken in context, the prosecutor's comment was not vouching for the credibility of Brown's testimony or placing the prestige of the government behind Brown, but was merely a comment to the jury to use their common sense in considering the plausibility of Spann's statement to the police.
We agree that the prosecutor's statement was not improper bolstering. "Improper bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony." Hutchinson v. State, 882 So.2d 943, 953 (Fla.2004) (citing Gorby v. State, 630 So.2d 544, 547 (Fla.1993)). A review of the record demonstrates that the State was not placing the prestige of the government behind Brown's testimony, nor was the State relying on anything outside of the record to support Brown's statements. In his statement to the police, Spann stated that he was at Brown's house during the crimes, and that no one saw him while he was home. During cross-examination, Brown said she was not working in November *1068 1997, and said she spent her days sitting on the porch. While she indicated she never saw Spann coming or going to the backyard on the day of the crimes, she acknowledged that someone could have come without her being aware of that fact. During closing arguments, defense counsel reiterated that Spann was at Brown's house during the abduction, murder, and bank robbery. As a result of the evidence presented, the prosecutor was attempting to demonstrate to the jury that it is not likely that Spann could have come home in the afternoon on the day of the crime and not have been seen by Brown, who sat on her porch all day. Because the prosecutor was making a fair comment based on the evidence presented at trial, counsel cannot be deemed ineffective for failing to object. See Mungin v. State, 932 So.2d 986, 997 (Fla.2006) (finding that defense counsel was not ineffective for failing to object because none of the comments were improper).
Accordingly, Spann fails to demonstrate ineffectiveness under Strickland. We affirm the trial court's denial of relief on this claim.

Failure to Challenge Philmore's Credibility
Spann next contends counsel was ineffective for failing to impeach Philmore with his prior inconsistent statements. Spann argues that impeachment was critical because Philmore was the only witness who directly implicated Spann as being present at the scene as well as planning and ordering the shooting death of Perron.
The record undisputedly demonstrates that Philmore made multiple inconsistent statements to the police after he was arrested. In his first statement, Philmore denied any involvement in the abduction and murder of Perron, and only admitted his involvement in the bank robbery. However, through the next four statements, he slowly began to admit his involvement in the abduction and murder. He first stated that although he was involved, Spann was the one who shot Perron and concealed her body. In his final statement, though, he admitted that he was the shooter and Spann was the mastermind behind the plan. At trial, during defense counsel's cross-examination of Philmore, Philmore admitted his involvement in the abduction, murder, and bank robbery. Although defense counsel did not question Philmore regarding the inconsistencies in his statements to the police, defense counsel did ask Philmore whether he lied when he was first questioned about his involvement. Philmore admitted that he had lied.
At the evidentiary hearing, counsel testified that although he was aware of Philmore's inconsistent statements, he did not question Philmore because he believed it was strategically better "to say look at the first statement, he doesn't know anything, and now he's telling he's seeing everything." In denying relief, the trial court found that counsel made a strategic and reasonable decision to not raise the issue of Philmore's multiple inconsistent statements during cross-examination.
Although counsel did not question Philmore specifically about each inconsistent statement, counsel still demonstrated that Philmore's trial testimony and his first statement to the police were inconsistent by having Philmore admit that he lied to the police in his first statement. Moreover, during cross-examination, counsel raised the fact that in Philmore's case, the jury had unanimously recommended a death sentence, and that the judge had not yet sentenced him, to demonstrate that Philmore was testifying against Spann to possibly gain mitigation of his sentence.
Because counsel's decision to not question Philmore about his inconsistent statements *1069 was a strategic, reasonable decision, counsel cannot be deemed ineffective. Counsel contemplated alternative courses, but decided it was better to just show that Philmore first lied when questioned by the police, but later admitted his involvement in the crimes. See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").
Accordingly, because Spann fails to satisfy either prong of Strickland, we affirm the trial court's denial of relief.

Ineffective Assistance of Counsel during Penalty Phase
Spann contends that both counsel and co-counsel were ineffective for failing to adequately investigate mitigating evidence for the penalty phase. We disagree and affirm the trial court's denial of postconviction relief on this claim. An attorney in a capital case has a duty to investigate and present to the court and the jury, when applicable, the mitigating evidence found to exist. However, the United States Supreme Court observed in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), that "Strickland[6] does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins v. Smith, 539 U.S. at 533, 123 S.Ct. 2527. Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable. Id. at 523, 123 S.Ct. 2527; Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. When making this assessment, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527, 123 S.Ct. 2527. In this case, we must also consider the fact that Spann waived presentation of mitigating evidence.
Spann first argues that counsel failed to provide Dr. Fred Petrilla, the mental health expert, with significant record information with which to conduct a thorough mental health evaluation of Spann. During the evidentiary hearing, counsel testified that he retained Dr. Petrilla as a matter of practice because Spann had been indicted for first-degree murder and the State was seeking the death penalty. Counsel could not recall whether he turned over any records to Dr. Petrilla. Counsel testified that before the penalty phase and after Spann waived the presentation of evidence, the trial judge asked counsel what evidence he would have presented had there been no waiver. Counsel indicated that he had school records, social records, and criminal history records concerning Spann. Counsel also testified that he advised the trial judge that Dr. Petrilla had performed some preliminary tests, but Spann refused to cooperate after the initial examination so Dr. Petrilla could not testify to anything.
Dr. Petrilla testified that before he met with Spann, he sat down with counsel several times and reviewed all the records that counsel provided to him. However, Dr. Petrilla indicated he no longer had any *1070 of his records because they were destroyed in a hurricane in 2004. Dr. Petrilla further testified that during his initial examination of Spann in February 2000,[7] Spann was cooperative and fully completed the evaluation. However, when Dr. Petrilla returned in March to conduct another evaluation, he was not able to complete the evaluation because Spann did not want to complete it. Dr. Petrilla tried to explain to Spann that it was important that Spann be cooperative, but Spann still refused to complete the evaluation. Counsel cannot be deemed ineffective when Spann thwarted counsel's efforts to seek mental health mitigation. Gore v. State, 784 So.2d 418, 438 (Fla.2001) (finding that counsel was not deemed ineffective when the defendant himself "thwarted defense counsel's efforts to secure mitigating evidence by refusing to cooperate with or be examined by several mental health experts").
Spann next argues counsel failed to present existing mitigation to the trial court. At a hearing prior to the penalty phase, defense counsel informed the trial judge that Spann did not want to present any mitigation. The trial judge then asked counsel whether there was mitigating evidence that could be presented. Defense counsel responded affirmatively and stated that the statutory mitigator that Spann was an accomplice with a relatively minor role in the capital murder was applicable. Counsel stated that nonstatutory mitigation would consist of family members testifying that Spann was a good son and sibling, he was a good student in school up to a point, and he did not begin getting into trouble until he began hanging around a bad crowd. Counsel also said that the defense would argue that the prison records show that Spann would be capable of living in an open prison environment without being a threat to himself or anybody else. At the evidentiary hearing, counsel testified about his efforts to investigate mitigation. He indicated that they reviewed school records, social records, and criminal records, and met with family members in West Palm Beach and Tallahassee. Counsel added that an argument could be made regarding Spann's age at the time of the commission of the offense. They could have also attempted to have Spann's wife testify that he was a good husband and good father.
At the evidentiary hearing, postconviction counsel called Dr. Bill Mosman to testify about applicable statutory and nonstatutory mitigation. He testified that there were two statutory mitigators that he would have found: (1) that the felony was committed while under extreme mental illness, and (2) Spann's age.[8] He also testified that there was other available nonstatutory mitigation that defense counsel failed to present. In a report, Dr. Mosman listed fifteen possible statutory and nonstatutory mitigators. However, in comparing Dr. Mosman's report to the sentencing order, there were only four mitigators that were neither raised by defense counsel nor considered by the trial court.[9] In denying Spann's claim of ineffective assistance of counsel, the trial court considered each of these possible mitigators and found that the deprived childhood was the only mitigator that counsel *1071 was deficient for not investigating. However, after evaluating all of the mitigation, the trial court found that the aggravators still outweighed the mitigating circumstances. Consequently, the trial court found that Spann failed to establish prejudice because the additional mitigators would not have resulted in the imposition of a life sentence.
Counsel cannot be deemed ineffective simply because he failed to find a few areas of potential mitigation. The record demonstrates that this is not a case where counsel conducted no investigation or presented no mitigation. Counsel testified at the evidentiary hearing that despite Spann's refusal to cooperate in presenting mitigation, counsel told co-counsel that he had to continue investigating possible mitigation because they had an obligation. He further testified that he and co-counsel went through possible statutory and nonstatutory mitigators, and in addition, talked to Spann's mother, grandmother, and brother for mitigation purposes. He also retained Dr. Petrilla to evaluate Spann. However, Spann refused to cooperate with the presentation of mitigation. Counsel testified that from the beginning of the trial, Spann told counsel that he did not want to present mitigation. According to defense counsel, there was nothing that he could have done to change Spann's mind. Both counsel and co-counsel tried to explain to Spann that without any mitigating evidence before the judge or jury, the judge would have to accept the aggravating circumstances with nothing to outweigh them.
As the United States Supreme Court noted in Strickland, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691, 104 S.Ct. 2052. In the instant case, defense counsel's investigation was limited by Spann's lack of cooperation. As a result, Spann's lack of cooperation undermines his allegations of ineffective assistance of counsel for failing to investigate additional mitigating evidence. See Rodriguez v. State, 919 So.2d 1252 (Fla.2005) (counsel was not ineffective when the defendant refused to cooperate with counsel and refused to offer information that would have helped in the presentence investigation); see also Cherry v. State, 781 So.2d 1040 (Fla.2000); Rose v. State, 617 So.2d 291 (Fla.1993). Accordingly, Spann fails to demonstrate ineffectiveness under Strickland.
Additionally, Spann argues that because counsel failed to adequately investigate and advise Spann of all existing mitigating evidence, Spann's waiver of the right to present mitigation and of the right to an advisory jury at the penalty phase was involuntary. The trial court denied relief and found that Spann knowingly and intelligently waived his rights. The trial court also noted this Court's finding on direct appeal that the waivers complied with the requirements set forth in Koon v. Dugger, 619 So.2d 246 (Fla.1993).[10] In Koon, we said:

*1072 When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.
619 So.2d at 250. In the instant case, both defense counsel and the trial judge followed the proper procedure to ensure that Spann understood his rights to both present mitigation and to have an advisory jury.
At the hearing prior to the penalty phase, defense counsel informed the trial judge that Spann wished to waive the presentation of mitigation. Counsel then reviewed possible mitigation that he had found through investigation. Spann agreed that counsel discussed this possible mitigation with him. The State also reviewed the aggravators it intended to rely on. Spann continued to waive his right to present mitigation. Spann further stated that he was not under any medication and that he understood his waiver could not be a basis for overturning the case. He added that he had been thinking about this decision since he arrived in jail in 1997. Counsel also informed the trial judge that Spann wished to waive his right to an advisory jury recommendation. Counsel explained to the trial judge that he discussed the role of an advisory jury with Spann and encouraged him to seek an advisory verdict. However, Spann told the judge that he understood his rights, but he still wished to waive his rights. He stated that he had an opportunity to discuss the decision with his counsel and had no questions. The trial judge even took extra precautions and gave Spann a few days to rethink his decision. However, a few days later, Spann again indicated that he wished to waive both rights. Counsel then filed a written waiver signed by Spann. Thus, the record supports the trial court's conclusion that Spann knowingly and voluntarily waived his right to present mitigation and his right to have an advisory jury recommendation.
Spann lastly asserts that his waivers were involuntary because of his ongoing depression. This claim also lacks merit. The only evidence indicating a diagnosis and treatment for depression was Spann's transfer form from Martin County Jail to Florida State Prison. The form indicated that Spann was on medication for depression. This form was dated July 12, 2000 and indicated that antidepressants had been prescribed to Spann on June 9, 2000. This diagnosis and treatment occurred after Spann's trial. Moreover, at the hearing where Spann waived his rights, Spann indicated that he was not on medication at the time or during the trial. In addition, Dr. Petrilla testified at the evidentiary hearing that in the one test that he completed with Spann, there was no indication that Spann was depressed. Thus, Spann fails to demonstrate that he was depressed at the time he waived his rights to present mitigation and to have an advisory jury.
*1073 Because Spann fails to demonstrate ineffective assistance of counsel under Strickland, we find that postconviction relief is not warranted.

CONCLUSION
For the reasons stated above, we affirm the trial court's finding that counsel was not ineffective and its denial of postconviction relief.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The issues raised were: (1) whether the trial court erred in admitting expert testimony as to handwriting identification because the expert testimony did not satisfy the requirements of Frye v. United States, 293 F. 1013 (D.C.Cir.1923); (2) whether the trial court failed to adequately follow the procedures required for granting a defendant's request to waive mitigation as set forth in Koon v. Dugger, 619 So.2d 246 (Fla. 1993); (3) whether the trial court erroneously found that Spann freely and voluntarily made a knowing and intelligent waiver of an advisory jury in the penalty phase trial; (4) whether the trial court improperly found and considered Spann's conviction for misdemeanor battery as an aggravating factor; (5) whether the trial court improperly doubled three separate aggravating circumstances; (6) whether the trial court failed to consider and weigh all the mitigating evidence in the record; and (7) whether the trial court abused its discretion in the weight assigned to the mitigating factors. The Court also did a proportionality assessment.
[3] Huff v. State, 622 So.2d 982 (Fla. 1993).
[4] Leo also testified that the reason he said it was between 2 and 3 p.m. at the deposition was because he did not understand the question.
[5] The Subaru is a manual shift car that Philmore could not drive.
[6] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[7] Spann's trial began in May 2000.
[8] Dr. Mosman opined that despite the fact that Spann was chronologically twenty-three years old, he had the emotional maturity of a twelve- or thirteen-year-old at the time of the crime.
[9] These mitigators were: (1) felony committed while defendant was under the influence of extreme mental or emotional disturbance; (2) family life; abuse and neglect; childhood history; (3) medical difficulties; and (4) use of alcohol and drugs.
[10] On direct appeal, Spann raised the same claim regarding both waivers. We found that the "trial court did not abuse its discretion when it granted Spann's request to waive presentation of mitigation," because the "record support[ed] the trial court's finding that Spann acted knowingly and intelligently when he waived presentation of mitigation, and that he did so on his own accord and not because counsel failed to adequately investigate existing or available mitigation." Spann, 857 So.2d at 854. Thus, this claim is procedurally barred. See Torres-Arboleda v. Dugger, 636 So.2d 1321, 1323 (Fla. 1994) ("Proceedings under rule 3.850 are not to be used as a second appeal; nor is it appropriate to use a different argument to relitigate the same issue."). With regard to the waiver of an advisory jury, we found that Spann was foreclosed from raising the claim on direct appeal because there was no motion to withdraw the waiver of the sentencing phase jury. Spann, 857 So.2d at 854-55; see also Griffin v. State, 820 So.2d 906, 913 (Fla.2002) ("[F]ailure of a capital defendant to first attack the voluntariness of a waiver of a sentencing jury at the trial court precludes review on direct appeal.").