PER CURIAM.
Nelson Serrano appeals his convictions for first-degree murder and sentences of death.[1] For the reasons stated below, we affirm.
BACKGROUND
On May 17, 2001, Nelson Serrano was indicted under seal on four counts of first-degree murder for the deaths of George Gonsalves, Frank Dosso, Diane Patisso, and George Patisso. The murders occurred on December 3, 1997, at Erie Manufacturing and Garment Conveyor Systems in Bartow. George Gonsalves was one of Serrano’s business partners. And Frank Dosso, Diane Patisso, and George Patisso were respectively the son, daughter, and son-in-law of Serrano’s other business partner, Felice (Phil) Dosso. Serrano, a dual citizen of the United States and Ecuador, was arrested in Ecuador on August 31, 2002, and brought to the United States.
At the guilt phase, which occurred in 2006, the State presented the following evidence. In the 1960s, Phil Dosso and George Gonsalves started a tool and die business, Erie Manufacturing Cooperative, in New York. Their business provided parts to support the garment industry. In the 1980s, Phil Dosso and George Gon-salves met Nelson Serrano, who was working for a New Jersey company selling slick rail systems for the garment industry. In the middle of the 1980s, the three men created a separate company, Garment Conveyor Systems. Serrano was responsible for designing, selling, and installing slick rail systems, while Dosso and Gon-salves built the parts.
In the late 1980s, the partners moved the business to Bartow, Florida. At that time, they closed Erie Manufacturing Cooperative and transferred all the assets to Erie Manufacturing, Inc. As part of their oral agreement, Serrano bought into the Erie partnership and agreed to pay Phil Dosso and George Gonsalves $75,000 each. Therefore, all three men were equal partners in both Garment Conveyor Systems and Erie Manufacturing. Garment moved to Bartow as well. Serrano’s son, Francisco Serrano, began working at the business soon after they relocated to Bartow, and Phil Dosso’s son, Frank Dosso, began working there at a later date. Phil Dos-so’s son-in-law, George Patisso, was also an employee of the business.
By the early 1990s, the business was doing well. However, friction between the three partners had developed. Nelson Serrano had failed to pay the $75,000 to each of his partners. Further, there were disagreements about the distribution of assets and accusations that there were two sets of books. Then, in the summer of 1997, Phil Dosso and George Gonsalves fired Francisco Serrano. Also in the sum *99 mer of 1997, Nelson Serrano opened a separate business checking account with a different bank and deposited two Erie checks totaling over $200,000. And Serrano instituted a civil suit against his partners. Ultimately, Serrano was removed as president by a vote of the other two partners, and the locks were changed on the building.
Numerous Erie employees testified to the strained relations between Serrano and the other two partners, particularly Serrano’s dislike of Gonsalves. Serrano made statements indicating that he wished Gonsalves were deceased. Additionally, Phil Dosso testified to hearing Serrano state that he felt like killing Gonsalves.
On the evening of the murders, most Erie employees left work at 5 p.m. or shortly thereafter. However, as was his usual practice, George Gonsalves worked late. David Catalan, an employee at Erie, testified that when he left with another employee shortly after 5 p.m. George Gon-salves’ car was the only car in the parking lot. Although George Patisso and Frank Dosso remained at Erie with Gonsalves, they did not have a car parked in front because George Patisso’s wife, Diane Pa-tisso, had plans to pick them up and take them to Frank Dosso’s home for a family birthday party.
When family members began calling Frank Dosso and could not get an answer, Phil Dosso and his wife decided to drive to Erie. As Phil and Nicoletta Dosso entered Erie’s unlocked front door, they discovered the deceased body of their daughter, Diane Patisso. Phil Dosso called 911 and ran to Frank Dosso’s office, where he discovered the bodies of George Gonsalves, George Patisso, and Frank Dosso.
When the first law enforcement officers arrived at the scene at 7:36 p.m., there were only three cars parked in front of the entrance: Phil Dosso’s car, Diane Patisso’s car, and George Gonsalves’ car. Inside Erie, law enforcement discovered twelve shell casings, eleven fi*om a .22 and one from a .32. All of the victims had been shot in the head with .22 bullets, and Diane Patisso was also shot once with a .32 bullet. The three men were shot execution-style. While neither murder weapon was ever located, the State introduced evidence that Serrano possessed and owned multiple .22 and .32 caliber firearms.
In the office containing the three male victims, officers discovered a blue vinyl chair with shoe impressions on the seat. Directly above the chair, a ceiling tile had been dislodged. Although this office was Frank Dosso’s office at the time of the murders, it had been Nelson Serrano’s office when he worked at Erie. David Catalan testified that on one occasion, he saw Serrano in his office with a gun. Serrano was standing on a chair, moving a ceiling tile, and taking papers out of the ceiling. Further, Erie employee Velma Ellis testified that the blue chair in Frank Dosso’s office was never used and always remained under a desk in the office and that there were papers and a box piled on top of the chair’s seat. Ellis testified that the chair was in its usual position under the desk when she left work on December 3, 1997, at 5 p.m. Crime analysts tested the shoe impressions on the dusty seat of the blue vinyl chair and found that the class characteristics and wear pattern were consistent with a pair of shoes Serrano owned and later loaned to a nephew.
The State’s theory at trial was that Serrano kept a .32 caliber firearm hidden in the ceiling of his office. Once he was ousted from the company and the locks were changed he was unable to retrieve the gun until the night of the murders. After Serrano had shot the three male victims in his former office and was leaving the scene, Diane Patisso entered the build *100 ing and was shot with both a .22 and the retrieved .32. An FDLE agent testified that Serrano told the agent that he would hide a gun in the ceiling of his office when he was out of town on business. However, Serrano’s fingerprints and DNA were not discovered at the crime scene.
When officers first discovered the four victims at Erie, their investigation immediately focused on Serrano. As soon as Serrano returned to his home from a business trip to Atlanta on December 4,1997, detectives requested that he come to the police station for an interview. At the police station, Serrano told law enforcement about his problems with his partners and explained to the detective that he had learned of the murders the previous evening when he had called his wife from his Atlanta hotel.
During his interview with law enforcement, Serrano detailed his business trip itinerary, which included leaving Lakeland early on the morning of December 2, flying from Orlando to Washington, D.C., and, on the evening of December 2, flying from Washington to Atlanta. Serrano indicated that he remained in Atlanta until December 4, 1997. When asked by the detective what he thought may have happened at Erie, Serrano replied that “somebody is getting even; somebody they cheated, and George is capable of that.” Thereafter, the detective took Serrano’s taped statement, which was played for the jury. During his taped statement, Serrano stated that maybe Diane Patisso “walked in the middle of something.”
Officers traveled to Atlanta to investigate Serrano’s alibi and met with Larry Heflin of Astechnologies regarding his business meeting with Serrano. Heflin testified that he met Serrano in Atlanta on December 3 at about 9:45 a.m., and the meeting lasted approximately one hour. Investigators also obtained the La Quinta Inn airport hotel’s surveillance videotapes. The video showed Serrano in the Atlanta hotel lobby at 12:19 p.m. on December 3. Ten hours later, at 10:17 p.m., Serrano was again seen on the video, entering the hotel lobby from the outside, wearing the same sweater and jacket as earlier in the afternoon.
Alvaro Penaherrera, Serrano’s nephew, testified that on two separate occasions Serrano asked Penaherrera to rent a car for him so that Serrano’s wife would not find out about the rentals. On October 29, 1997, Serrano drove Penaherrera to the Orlando airport, where Penaherrera picked up a rental car. Penaherrera then drove the car and left it at a nearby valet lot. Thereafter, Serrano drove Penaherr-era back to his apartment. Penaherrera had no further contact with the rental car and did not know who returned it on October 31,1997, at 7:30 p.m.
Around Thanksgiving 1997, Serrano again asked Penaherrera to rent a car for him under Penaherrera’s name because Serrano had a girlfriend from Brazil coming into town. On November 23, 1997, Penaherrera made a telephone reservation for a rental car for December 3, 1997. On December 3, 1997, at 7:53 a.m., Serrano called Penaherrera from Atlanta and asked him to call to confirm the rental car reservation. Serrano called Penaherrera back at 8:06 a.m. to verify that the rental car would be ready. Penaherrera then drove to Orlando’s airport and parked his car in the parking garage, rented the car from the terminal dealership, and drove the rental car back to the Orlando airport parking garage, where he left it as his uncle requested. Later that day, Serrano called Penaherrera, and Penaherrera told Serrano where the car was located and where the keys were hidden.
As on the previous occasion in October, Penaherrera did not expect to have any *101 further involvement with the rental car after he left it at the Orlando airport parking garage on December 3. However, Serrano called Penaherrera the next day, December 4, to tell Penaherrera that the rental car was in Tampa, not Orlando, and that Penaherrera needed to drive to Tampa and return the car there. Serrano told Penaherrera if he went to Tampa and returned the car, Serrano would pay off Pen-aherrera’s credit card bill and Penaherrera could pay him back without interest. Pen-aherrera agreed to this arrangement and returned the rental car in Tampa at 2:10 p.m. on December 4, 1997. Gustavo Con-cha, Serrano’s friend and Penaherrera’s godfather, subsequently paid Penaherr-era’s Visa bill.
Penaherrera next saw Serrano when he was visiting relatives in Ecuador for Christmas of 1997. Serrano informed Penaherrera of the murders at Erie and told Penaherrera that he could not say anything about the rental cars because it would jeopardize his marriage and the police would frame him for the murders.
In June 2000, Penaherrera, his girlfriend, and his brother were subpoenaed to testify before the grand jury. The three spent the night at Serrano’s house the night before their testimony. That night Serrano asked Penaherrera to tell the grand jury that he had rented the car for a Mend with whom he had subsequently lost contact. Serrano also gave Penaherrera and his brother suits and dress shoes to wear to court. The pair of shoes that Serrano gave Penaherrera were seized by law enforcement, and subsequent testing indicated that the right shoe was consistent with the impression on the seat of the blue chair at the murder scene.
Also in June 2000, Penaherrera spoke for the first time with law enforcement regarding the December 1997 rental car transaction. And after his testimony and discussions with law enforcement, Penah-errera returned home to Orlando, where Serrano contacted him to End out what information he had given to the grand jury and law enforcement. After Penaherrera testified before the grand jury, Serrano sold his home, car, and other assets and moved to Ecuador.
The State introduced evidence regarding Serrano’s air travel for his December 1997 business trip. As explained previously, Serrano flew from Orlando to Washington, D.C., and then to Atlanta, on December 2, 1997. However, contrary to his statements to law enforcement, the State also introduced evidence that Serrano traveled back to Florida on the day of the murders using two aliases. The State theorized that on the day of the murders Serrano flew from Atlanta to Orlando under the name Juan Agacio. Serrano then drove the car rented by Penaherrera on December 3 from the Orlando airport to Bartow, where he killed the four victims. Thereafter, he immediately drove the rental car to the Tampa airport, where he departed on a flight back to Atlanta using the alias John White.
To support its theory and timeline of Serrano’s activities on the day of the murders, the State introduced the videotape evidence demonstrating that Serrano was in the La Quinta Inn’s lobby in Atlanta shortly after noon on December 3, 1997. According to Serrano, he returned to his hotel room for the next ten hours because he was suffering from a migraine headache. However, the State introduced evidence that at 1:36 p.m. on December 3 a passenger calling himself Juan Agacio boarded Delta flight 1807 in Atlanta, scheduled to depart at 1:41 p.m. for Orlando. At 3:05 p.m., the passenger purporting to be Juan Agacio arrived in Orlando on flight 1807, and at 3:49 p.m., the rental *102 car that Penaherrera had rented exited the Orlando parking garage.
Serrano’s fingerprint was located on the parking garage ticket, indicating that Serrano departed from the Orlando airport garage at 3:49 p.m. on December 3, 1997. And Serrano has a son, who was named Juan Carlos Serrano at birth and whose mother’s maiden name is Gladys Agacio. Additionally, the round-trip ticket for the Atlanta-to-Orlando flight of the passenger flying under the name Juan Agacio was purchased with cash at the Orlando airport on November 23, 1997, which is the same date that Penaherrera reserved the rental car for December 3, 1997. The State also introduced evidence that Serrano’s vehicle left the Orlando airport’s parking garage about twenty minutes after the passenger traveling under the name Juan Agacio purchased his ticket. The return portion of the flight was never used.
At approximately 5:30 p.m. on December 3,1997, a person was seen standing off the side of the road near Erie’s building. When John Purvis left work on December 3, 1997, he noticed the man wearing a suit standing in the grassy area with no car in the vicinity. The man was holding his coat and hands in front of his face as if he were lighting a cigarette. Both Alvaro Penah-errera and Maureen Serrano testified that Serrano smoked, but they did not testify that he specifically smoked cigarettes. Purvis described the man, and law enforcement made a composite sketch that was shown to the jury.
Approximately two hours after the murders, at 7:28 p.m., the passenger flying under the name John White arrived at Tampa International Airport and checked into Delta Airlines for flight 1272 to Atlanta. Similar to the purchasing process for the ticket in the name of Juan Agacio, the purchaser paid for a round-trip ticket at Tampa International Airport on November 23,1997, and never used the return portion of the ticket. Flight 1272 was scheduled to arrive in Atlanta at 9:41 p.m.
At 10:17 p.m., Serrano was observed in Atlanta on videotape walking into the La Quinta Inn airport hotel lobby from the outside, wearing the same clothes he had been wearing ten hours earlier. After being observed in the hotel lobby, Serrano used his cell phone to call various individuals, including his wife. The next morning he made multiple calls to Alvaro Penaherr-era telling him he had to return the rental car that was now located at Tampa airport.
Furthermore, the State presented evidence that the car rented by Penaherrera on December 3 had been driven 139 miles. The distance from the Orlando airport to Erie is eighty miles, and the distance from Erie to the Tampa airport is fifty miles, totaling 130 miles.
While incarcerated awaiting trial, Serrano spoke to fellow inmate and “jailhouse lawyer,” Leslie Todd Jones, about his case. Serrano denied any involvement in the murders, telling Jones that he believed a mafia hitman may have committed the murders, or alternatively, that Frank Dos-so wanted to take over the business from George Gonsalves. The main theory Serrano described involved a hitman Serrano knew only as John, who was owed a substantial amount of money by the Dosso and Gonsalves families. Serrano explained to Jones that he and the hitman drove to the airports in Tampa and Orlando and that John purchased tickets under the names of Todd White and Juan Agacio. Serrano told Jones that the hitman had planned to approach the business partners on Halloween night, but it was raining and the business was closed. Serrano also told Jones about his fingerprint being found on a parking ticket in Orlando, but Serrano claimed that an FDLE agent had planted his fingerprint.
*103 After law enforcement learned about the Halloween incident from inmate Jones, they began investigating and discovered almost an identical pattern of travel as the travel surrounding the December 3, 1997, murders. Serrano once again was traveling on a business trip from Orlando to Charlotte from October 30 to November 2, 1997. And as previously discussed, on October 29, Serrano took Alvaro Penaherrera to the Orlando airport, where Penaherrera rented a car for Serrano and left it at a nearby valet lot. The next morning, October 30,1997, Serrano flew from Orlando to Charlotte with his flight arriving in Charlotte at 8:34 a.m. The following day, Halloween, someone traveling under the name Juan Agacio took a flight departing from Charlotte at 1:40 p.m. and arriving in Orlando at 3:07 p.m. At 7:30 p.m., a passenger identified as John White was scheduled to depart on a flight from Tampa to Charlotte.
During the guilt phase, the defense maintained that Serrano had been in an Atlanta hotel room with a migraine at the time of the murders. The defense emphasized that no forensic evidence linked Serrano to the scene of the crimes. The defense also pointed out that there was evidence of robbery at the scene as several offices were in disarray, Frank Dosso’s Rolex watch was missing, and George Pa-tisso’s gold chain was missing. However, the jury returned a verdict finding Serrano guilty on four counts of first-degree murder.
At the penalty phase, the State presented victim impact statements, and the parties stipulated that Serrano was fifty-nine years of age at the time of the murders and that Serrano had no prior criminal history. The defense presented evidence that Serrano never received any disciplinary reports while incarcerated awaiting trial. The jury recommended a sentence of death by a vote of nine to three for each of the four murder counts.
At the Spencer[2] hearing, Serrano presented numerous witnesses, some of whom testified by videotape from Ecuador. Then, on June 26, 2007, the trial court sentenced Serrano to death for each of the four murders. The trial court found the following aggravators in regards to all four murders: (1) the murders were committed in a cold, calculated, and premeditated manner (great weight); and (2) Serrano was convicted of other capital felonies (the contemporaneous murders) (great weight). The trial court also found that the murder of Diane Patisso was committed for the purpose of avoiding arrest (great weight). Additionally, the trial court found the following mitigators: (1) Serrano had no significant history of prior criminal activity (great weight); (2) Serrano was in his late fifties at the time of the crimes (some moderate weight); (3) Serrano performed well in school (moderate weight); (4) Serrano has a good social history (moderate weight); (5) Serrano had no history of drug or alcohol abuse (some weight); (6) Serrano was a successful Hispanic immigrant (moderate weight); (7) Serrano displayed positive behavior during his pretrial incarceration (some weight); (8) Serrano displayed positive behavior during his court appearances (some weight); (9) Serrano expressed remorse regarding the death of Diane Patisso (slight weight); (10) Serrano had a good employment history (some weight); (11) Serrano was a good husband (some weight); (12) he was a good father (some weight); (13) Serrano was positively involved in his religion (some weight); and (14) he had a significant history of good works (moderate weight).
*104 ISSUES ON APPEAL
Serrano raises nine issues on appeal: (1) whether the circumstantial evidence is sufficient to support his convictions; (2) whether Serrano’s statements to FDLE Agent Tommy Ray were admissible; (3) whether the trial court properly denied Serrano’s motions to dismiss the indictment and divest itself of jurisdiction; (4) whether the prosecutor engaged in misconduct that entitles Serrano to relief; (5) whether the trial court properly denied Serrano’s motion for a change of venue; (6) whether the testimony of the State’s bloodstain pattern expert was admissible; (7) whether the State improperly cross-examined Serrano’s character witnesses about collateral crimes at the Spencer hearing; (8) whether the avoid arrest ag-gravator was properly submitted to the jury and found by the trial court; and (9) whether Serrano’s death sentence is constitutional. We also review whether Serrano’s death sentences are proportionate. However, as explained below, none of these issues warrants relief.

(1) Sufficiency of Evidence

Serrano argues that the trial court should have granted his motion for judgment of acquittal in this circumstantial evidence ease. We disagree.
“In reviewing a motion for judgment of acquittal, a de novo standard of review applies.” Reynolds v. State, 934 So.2d 1128, 1145 (Fla.2006) (citing Pagan v. State, 830 So.2d 792, 803 (Fla.2002)). “[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.” Id. (quoting Lynch v. State, 293 So.2d 44, 45 (Fla.1974)). “However, ‘where a conviction is based wholly upon circumstantial evidence, a special standard of review applies.’ ” Id. (quoting Darling v. State, 808 So.2d 145, 155 (Fla.2002)).
“[A] motion for judgment of acquittal should be granted in a case based wholly upon circumstantial evidence if the [S]tate fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt.” Id. at 1146. However, “[t]he [S]tate is not required to ‘rebut conclusively every possible variation’ of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events.” Darling, 808 So.2d at 156 (quoting State v. Law, 559 So.2d 187, 189 (Fla. 1989)). “Once the State meets this threshold burden, it becomes the jury’s duty to determine ‘whether the evidence fails to exclude all reasonable hypotheses of innocence ..., and where there is substantial, competent evidence to support the jury verdict, [the Court] will not reverse.’” Reynolds, 934 So.2d at 1146 (quoting Law, 559 So.2d at 188).
In this case, Serrano’s hypothesis of innocence was that he was in his hotel room in Atlanta suffering from a migraine when the murders took place. But the State introduced competent evidence that is inconsistent with Serrano’s alibi. Most significantly, the State produced fingerprint evidence placing Serrano at the airport in Orlando during the time he claims he was in Atlanta. His fingerprint was discovered on a parking ticket, indicating that Serrano departed from the Orlando airport at 3:49 p.m on December 3,1997.
Because the State met its burden of rebutting Serrano’s alibi hypothesis, it became the jury’s duty to determine whether the evidence failed to exclude all reasonable hypotheses of innocence. See Reynolds, 934 So.2d at 1146. And there is competent substantial evidence to support *105 the jury’s determination in this case. See id.
First, the State introduced circumstantial evidence of an elaborate plan to establish an alibi, a plan Serrano developed and began to implement ahead of time. Using Serrano’s travel itinerary, the travel itineraries of the person flying under the names of Juan Agacio and John White, and Alvaro Penaherrera’s car rentals, the State demonstrated that on the day of the murders Serrano flew from Atlanta to Orlando under the name Juan Agacio, drove the car rented by Penaherrera to Bartow, and then drove the car to Tampa, where he flew back to Atlanta as John White. Then, once he returned to Atlanta and was visible on his hotel’s surveillance system, Serrano began using his cell phone.
Second, the State introduced circumstantial evidence to place Serrano at Erie at the time of the murders. Specifically, the State presented evidence of a dislodged ceiling tile in Serrano’s former office, testimony that Serrano would hide items in the ceiling by dislodging a ceiling tile in his office, and testimony that a shoe impression on a chair below the dislodged ceiling tile was consistent with a shoe that Serrano owned. The State also introduced a composite sketch of a male seen outside the crime scene near the time of the murders. The jury was able to view the composite sketch and compare it to Serrano’s appearance on the day of the murders as depicted in the Atlanta hotel’s surveillance video. Finally, the State presented evidence regarding Serrano’s statements to police the day after the murders. The jury heard Serrano’s taped interview with police from the day after the murders where Serrano stated that Diane Patisso must have “walked in the middle of something,” a fact that had not been released to the public.
Furthermore, there is evidence that Serrano had motive to kill Gonsalves, namely testimony regarding business problems between the partners and testimony that Serrano had expressed animosity towards Gonsalves and had even stated that he wished Gonsalves were deceased. There is also evidence that Serrano had access to the caliber of firearms used to shoot the victims.
Given this competent substantial evidence supporting an inference of guilt to the exclusion of all other inferences, we conclude that the evidence is sufficient to support Serrano’s convictions. The trial court properly denied Serrano’s motion for judgment of acquittal.

(2) Statements to Florida Department of Law Enforcement (FDLE) Agent

Next, Serrano argues that the trial court erred in denying his motion to suppress the statements he made to FDLE Agent Ray while traveling from Ecuador to the United States. After Serrano was placed on an airplane with Agent Ray to travel to Florida, he was read his Miranda rights. The FDLE agent then asked Serrano if he wished to make a statement. Serrano responded that he did not wish to say anything “at this time.” Less than two hours later, Serrano asked the FDLE agent how much they had paid the police in Ecuador to capture him. After answering that they had not paid the Ecuadorian police anything, the FDLE agent began asking Serrano questions. Agent Ray did not readvise Serrano of his rights or obtain a waiver. This conversation lasted approximately thirty minutes. Eventually, Serrano told the FDLE agent that the agent was starting to talk business and that he did not want to talk business. The questioning stopped at that point.
Agent Ray testified that Serrano stated the following during their conversation on *106 the plane: (1) Serrano did not return to the United States to attend a civil hearing in his lawsuit against his Erie partners because he thought the hearing was a trick; (2) he had deposited the checks in the other bank to stop his partners from stealing the funds; (3) Gonsalves “was nothing but a liar, a swindler, and a thief”; (4) Frank Dosso was connected to the mafia, and the murders were the result of Frank Dosso hiring a hitman that he had never met before; (5) Penaherrera had rented a car on December 3, 1997, for Serrano’s Brazilian girlfriend; (6) Serrano was not in Florida on the date of the murders; (7) he had a son named Juan Carlos; and (8) when he worked at Erie he would hide his .357 revolver in the ceiling of his office or behind his computer.
As this Court has explained,
[ajppellate courts should continue to accord a presumption of correctness to the trial court’s rulings on motions to suppress with regard to the trial court’s determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues.
Welch v. State, 992 So.2d 206, 214 (Fla.2008) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)).
When faced with a defendant who was advised of his rights, initially exercised his right to remain silent, and then initiated a conversation with law enforcement and eventually confessed, this Court in Welch, 992 So.2d at 214, generally stated the following:
In Miranda, the United States Supreme Court determined that the Fifth and Fourteenth Amendments’ prohibition against self-incrimination requires advising a prospective defendant that he has the right to remain silent and also the right to the presence of counsel. 384 U.S. at 479, 86 S.Ct. 1602; Edwards v. Arizona, 451 U.S. 477, 481-82, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). After being advised of his rights, if an accused indicates that he wishes to remain silent, “the interrogation must cease.” Miranda, 384 U.S. at 474, 86 S.Ct. 1602; see also Edwards, 451 U.S. at 482, 101 S.Ct. 1880.
Then, when determining the admissibility of the defendant’s confession, this Court applied the standard enunciated by the United States Supreme Court in Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
In this case, we do not determine whether the admission of Serrano’s statements to Agent Ray was erroneous under Bradshaw, because any possible error here was harmless. The evidence was generally cumulative of other evidence presented. For example, an Erie employee testified to seeing Serrano with a gun in his office while Serrano was standing on a chair removing something from the ceiling. A bank employee testified to the fact that Serrano had opened a separate checking account to deposit Erie funds. Additionally, a fellow inmate testified that Serrano had told him that the murders may have been the result of a mafia hitman or the result of Frank Dosso wanting to take over the business. And Penaherrera testified that he rented the car for Serrano and that Serrano stated that he needed the car for his Brazilian girlfriend. Basically, the only statement that was not cumulative of other evidence was Serrano’s statement that he did not return to the United States for the hearing in his civil case because it was a trick. However, there is no reasonable possibility that this statement about the civil hearing affected the verdicts in this case. Therefore, Serrano is not entitled to relief.

*107
(3) Jurisdiction

Serrano argues that the trial court lacked jurisdiction because he claims he was illegally kidnapped from Ecuador to stand trial in Florida in violation of the extradition treaty between the United States and Ecuador and in violation of the Ecuadorian Constitution. Serrano also claims that the actions of FDLE in bringing Serrano to Florida were so outrageous that the due process clauses of the U.S. and Florida Constitutions required the trial court to divest itself of jurisdiction. In support of this argument, Serrano’s brief quotes his motion in the trial court as well as a report of the Inter-American Commission on Human Rights of the Organization of American States, which was attached to that motion. The quoted motion alleges that FDLE agents “collaborated with Ecuadorian Police to seek the deportation of Mr. Serrano from Ecuador. Such action was illegal because the Defendant was also an Ecuadorian Citizen and not subject to lawful deportation.” The quoted motion also claims that Serrano “was arrested with no other process, in Ecuador. He was physically restrained, thrown into an animal cage, held incommunicado and the next day surreptitiously flown to the State of Florida.” Serrano’s brief states that he was physically abused and suffered bruises and abrasions.
At an evidentiary hearing, Agent Ray testified that Ecuadorian national police officers captured Serrano in Ecuador. Then, after Serrano was deported, the Ecuadorian police turned Serrano over to FDLE. Agent Ray also testified that Serrano was never housed in an animal cage but instead was housed in an office complex located at a police canine unit. Additionally, an ombudsman from Ecuador testified that he had concluded that Serrano held dual citizenship and, therefore, was improperly deported from Ecuador following a hearing before an Ecuadorian official.
We affirm the trial court’s denial of Serrano’s motion to divest jurisdiction and dismiss the indictment. In United States v. Alvarez-Machain, 504 U.S. 655, 657, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), the United States Supreme Court held that “a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, [does not] thereby acquire[ ] a defense to the jurisdiction of this country’s courts.” Specifically, Alvarez-Machain involved a citizen and resident of Mexico who was forcibly kidnapped at the behest of DEA agents to stand trial in the United States. Id. And Alvarez-Machain cited and relied upon Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952), a case which involved a U.S. citizen defendant who had been kidnapped in Chicago by Michigan officers to stand trial in Michigan. In Frisbie, the United States Supreme Court upheld the defendant’s conviction against claims alleging violations of the due process clause and the federal kidnapping statute. Frisbie, 342 U.S. at 522-23, 72 S.Ct. 509. In doing so, the United States Supreme Court stated the following:
This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444 [7 S.Ct. 225, 30 L.Ed. 421 (1886) ], that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court’s jurisdiction by reason of a “forcible abduction.” No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedur *108 al safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.
Id. at 522, 72 S.Ct. 509 (footnote omitted).
The Second Circuit Court of Appeals in United States v. Toscanino, 500 F.2d 267 (2d Cir.1974), recognized an exception to the Ker-Frisbie doctrine in some cases of extreme government misconduct. In Toscanino, 500 F.2d at 268, the defendant alleged “the court acquired jurisdiction over him unlawfully through the conduct of American agents who kidnapped him in Uruguay, used illegal electronic surveillance, tortured him [in Brazil for seventeen days,] and abducted him to the United States for the purpose of prosecuting him here.” However, even if there is an exception to the Ker-Frisbie doctrine,[3] there are no allegations in this case of misconduct similar to the level of misconduct present in Toscanino.
Accordingly, we conclude that Serrano’s claim that the trial court lacked jurisdiction over him because he was illegally deported from Ecuador is without merit.

(4) Prosecutorial Misconduct

Serrano also argues that the impact of the following prosecutorial misconduct requires reversal of his convictions and sentences: (a) commenting on Serrano’s right to remain silent, (b) vouching for the credibility of State witnesses, (c) eliciting testimony to demonstrate lack of remorse, (d) eliciting testimony to demonstrate bad character, (e) labeling Serrano as diabolical and a liar, and (f) improperly shifting the burden of proof. However, we conclude that relief is not warranted.

(a) Right to Remain Silent

“A defendant has the constitutional right to decline to testify against himself in a criminal proceeding.” Rodriguez v. State, 758 So.2d 29, 37 (Fla.2000). Therefore, this Court has explained that “any comment on, or which is fairly susceptible of being interpreted as referring to, a defendant’s failure to testify is error and is strongly discouraged.” Id. (quoting State v. Marshall, 476 So.2d 150, 153 (Fla. 1985)). “However, it is well settled that such erroneous comments do not require an automatic reversal.” Id. at 39. Furthermore, a trial court’s ruling on a motion for mistrial is subject to an abuse of discretion standard of review. See id. “[A] motion for mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.” Salazar v. State, 991 So.2d 364, 372 (Fla.2008) (quoting England v. State, 940 So.2d 389, 401-02 (Fla.2006)).
Serrano contends that the State improperly commented on his right to remain silent three times. First, the State asked FDLE Agent Ray, “Did Mr. Serrano appear before the Polk County Grand Jury?” Immediately after this question, Serrano’s counsel objected and moved for a mistrial. The trial court sustained the objection, but denied the mistrial. However, because the trial court sustained the objection before *109 the agent had answered the question, the jury never heard that Serrano did not appear before the grand jury. And the trial court instructed the jury to disregard the prosecutor’s question. Thus, any error was not so prejudicial so as to deny Serrano a fair trial. Consequently, the trial court did not abuse its discretion in denying Serrano’s motion for a mistrial.
Serrano also argues the State improperly commented on Serrano’s right to remain silent during opening arguments when the prosecutor stated that Serrano “had to come up with a story to tell a jury about how his fingerprint got on that ticket.” The trial court overruled Serrano’s objection and denied his motion for mistrial. The trial court did not abuse its discretion in making these ruling as the prosecutor explained that fellow inmate Leslie Todd Jones would testify at trial that Serrano told him that he needed to come up with a way to explain the fingerprint evidence and Leslie Todd Jones in fact testified that Serrano claimed that FDLE planted the fingerprint evidence. Furthermore, any possible error in allowing this statement was harmless given that it could not have affected the verdicts. See Rodriguez, 758 So.2d at 88 (stating that the proper standard of review for an overruled objection is a harmless error standard).
In addition, Serrano contends that the State improperly commented on his right to remain silent when the prosecutor stated during opening statements that the day after the murders was “Mr. Serrano’s opportunity to tell the police what happened at Erie Manufacturing.” After this statement, the trial court sustained Serrano’s objection, but denied his motion for mistrial. The trial court did not abuse its discretion in denying Serrano’s mistrial motion because, factually speaking, Serrano’s first opportunity to speak to the police was the day after the murders when he voluntarily went to the police station upon his return from Atlanta. Moreover, at the close of evidence, the trial judge instructed the jury that Serrano had the absolute right to remain silent.

(b) Vouching for Credibility of Witnesses

It is improper for the State to place the government’s prestige behind a witness or to indicate that information not presented to the jury supports a witness’s testimony. Spann v. State, 985 So.2d 1059, 1067 (Fla.2008).
Serrano alleges that the State improperly vouched for the credibility of its witness when it asked Erie employee David Catalan the following: “And did I tell you the most important thing to do was to tell the truth?” David Catalan responded, “Yes, sir.” Thereafter, defense counsel objected and moved for a mistrial. The trial court sustained the objection, denied the mistrial, and gave a curative instruction. While improper, this question and answer was not so prejudicial as to vitiate the entire trial, particularly since the trial judge gave a curative instruction. Specifically, the trial judge informed the jury that “it is improper for a lawyer to vouch for the credibility of a witness.” Therefore, the trial court did not abuse its discretion in denying Serrano’s motion for mistrial.
Next, Serrano contends that the State improperly bolstered the testimony of inmate Leslie Todd Jones by eliciting from him that, if he was untruthful, his probation would be revoked. The trial court sustained Serrano’s objection, but denied his motion for mistrial. The trial court did not abuse its discretion in denying the mistrial motion. First, the State asked the question on redirect after Serrano impeached Jones regarding his plea *110 agreement. Moreover, the trial court instructed the jury that they had to decide for themselves whether Jones was telling the truth. Specifically, the trial court told the jury, “And in regard to this witness, it [is] your job, it is you who are to decide who is telling the truth.” Under these circumstances, a mistrial was not needed.

(e) Lack of Remorse

This Court has explained that it is improper for a prosecutor to ask a witness in a capital case if the defendant exhibits a lack of remorse. See Randolph v. State, 562 So.2d 331, 337-38 (Fla.1990).
Serrano alleges that the State improperly elicited that Serrano lacked remorse by asking Detective Parker if Serrano cried when he was interviewed the day after the murders. Detective Parker responded, “No.” However, the trial court sustained Serrano’s objection, denied Serrano’s motion for mistrial, and instructed the jury to disregard the question and answer. Particularly given the curative instruction, this question and answer were not so prejudicial as to vitiate the entire trial. Additionally, while the prosecutor in this case asked if Serrano cried, he did not argue to the jury that Serrano lacked remorse for these murders. Cf. Robinson v. State, 520 So.2d 1 (Fla.1988). Therefore, the trial judge did not abuse its discretion in denying the motion for mistrial.

(d) Bad Character

Section 90.404(1), Florida Statutes (2005), provides that generally “[e]vidence of a person’s character or a trait of character is inadmissible to prove action in conformity with it on a particular occasion.” See also Young v. State, 141 Fla. 529, 195 So. 569, 569 (1939) (“[A] defendant’s character may not be assailed by the State in a criminal prosecution unless good character of the accused has first been introduced.”). Moreover, section 90.404(2), Florida Statutes, explains that “[sjimilar fact evidence of other crimes, wrongs, or acts ... is inadmissible when the evidence is relevant solely to prove bad character or propensity.”
Serrano contends that the State improperly made comments and elicited evidence for the sole purpose of demonstrating Serrano’s bad character. First, Serrano points to the prosecutor’s statement during opening argument that Serrano decided to “take some money owed to the two corporations and open up his own bank account” and that the banker at the new bank “knows something ain’t right. You can’t open corporate accounts by yourself.” Defense counsel objected and moved for a mistrial. The trial court sustained the objection, denied the mistrial motion, and instructed the jury to disregard these comments. However, the State was not making this argument for the sake of demonstrating Serrano’s alleged bad character. Instead, the State was making this argument, and later elicited testimony consistent with these statements, for the relevant purpose of establishing that Serrano had a motive to kill his business partner because there were disagreements about the distribution of company assets and income. Furthermore, these comments are not so prejudicial as to vitiate the entire trial, particularly since the trial judge instructed the jury to disregard them.
In addition, Serrano argues that the State improperly elicited evidence that Serrano owned multiple guns for the purpose of implying that since Serrano owned a lot of guns, he must have been the killer in this case. Although general ownership of guns does not provide evidence that one committed a murder, the evidence introduced in this case demonstrated that *111 Serrano was familiar with and owned the caliber of firearms used to commit these murders. Moreover, even if the admission of this gun evidence were considered error, the error would be harmless beyond a reasonable doubt. See Jones v. Moore, 794 So.2d 579, 585 (Fla.2001) (upholding admission of photos of defendant with guns that were similar to guns used in the murder and concluding that even if the admission of the photos were considered to be error, it was harmless error).
Serrano also argues that the State elicited bad character evidence based upon inmate Jones’ comment that he and Serrano met when they were both housed in Q Dorm, which is protective custody. Jones explained that protective custody is a section where people accused of murder and sex crimes are housed. The trial court sustained Serrano’s objection to this protective custody comment, denied his motion for mistrial, and instructed the jury to disregard it. However, as the trial court noted, the jury was aware that Serrano was accused of murder. Consequently, any prejudice from Jones’ comment did not deprive Serrano of a fair trial.

(e) Diabolical Liar

Serrano alleges that the State improperly called Serrano diabolical and a liar during closing arguments. This Court has stated that closing arguments “must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant.” King v. State, 623 So.2d 486, 488 (Fla.1993) (quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985)). And in Gore v. State, 719 So.2d 1197, 1201 (Fla.1998), this Court stated that “[i]t is clearly improper for the prosecutor to engage in vituperative or pejorative characterizations of a defendant or witness.” However, because Serrano failed to contemporaneously object, this claim is not preserved for appellate review. See Sims v. State, 681 So.2d 1112, 1116-17 (Fla.1996) (concluding that claim based on State’s reference to defendant as a liar was not properly before the appellate court without an objection). Moreover, if there was error, it does not rise to the level of fundamental error.

(f) Shifting Burden of Proof

Serrano argues that the State improperly shifted the burden of proof by stating the following during closing arguments: (1) ‘You can’t come up with any other theory that fits that anybody else would have done it”; (2) “He talks about this being a professional hit. There is no evidence. There is no evidence that these crimes are any kind of professional hit.” However, like Serrano’s liar claim, this claim is not preserved for appellate review because defense counsel failed to contemporaneously object. It also does not rise to the level of fundamental error as it does not “reach[ ] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Archer v. State, 934 So.2d 1187, 1205 (Fla. 2006) (quoting Kilgore v. State, 688 So.2d 895, 898 (Fla.1997)).
Given the above, we deny Serrano’s claim that the cumulative impact of the prosecutorial misconduct in this case warrants reversal.

(5) Change of Venue

Serrano contends that the trial court abused its discretion when denying Serrano’s motion for a change of venue because of the publicity surrounding this case. We affirm the trial court’s denial of the motion.
In Henyard v. State, 689 So.2d 239, 245 (Fla.1996), this Court stated the *112 following when upholding a trial court’s ruling denying a motion for change of venue based upon pretrial publicity:
In McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977), we adopted the test set forth in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), and Kelley v. State, 212 So.2d 27 (Fla. 2d DCA 1968), for determining whether to grant a change of venue:
Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.
[344 So.2d at] 1278 (quoting Kelley, 212 So.2d at 28). See also Pietri v. State, 644 So.2d 1347 (Fla.1994), cert. denied, 515 U.S. 1147, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995). In Manning v. State, 378 So.2d 274 (Fla.1980), we further explained:
An application for change of venue is addressed to the sound discretion of the trial court, but the defendant has the burden of ... showing that the setting of the trial is inherently prejudicial because of the general atmosphere and state of mind of the inhabitants in the community. A trial judge is bound to grant a motion for a change of venue when the evidence presented reflects that the community is so pervasively exposed to the circumstances of the incident that prejudice, bias, and preconceived opinions are the natural result. The trial court may make that determination upon the basis of evidence presented prior to the commencement of the jury selection process, or may withhold making the determination until an attempt is made to obtain impartial jurors to try the cause.
Id. at 276 (citation omitted). Ordinarily, absent an extreme or unusual situation, the need to change venue should not be determined until an attempt is made to select a jury.
Similar to the prospective jurors in Hen-yard, the prospective jurors in this case were questioned extensively during voir dire about their “exposure to the pretrial publicity surrounding the case.” Henyard, 689 So.2d at 245-46. These voir dire proceedings indicate that a large number of the venire had never heard any of the details of the case. And a number of potential jurors who were familiar with the case were struck for cause. The other jurors who had heard something about the case stated that they could be fair and impartial or that they had not formed an opinion and would base any opinion on the evidence presented. See id.; see also Rolling v. State, 695 So.2d 278, 285 (Fla. 1997) (“[I]f prospective jurors can assure the court during voir dire that they are impartial despite their extrinsic knowledge, they are qualified to serve on the jury, and a change of venue is not necessary.”). Therefore, the record here “demonstrates that the members of [Serrano’s] yenire did not possess such prejudice or extensive knowledge of the case as to require a change of venue.” Henyard, 689 So.2d at 246.
Accordingly, the trial court did not abuse its discretion in denying Serrano’s change of venue motion.

(6) Bloodstain Pattern Expert

Serrano claims that his constitutional right to confront the witnesses against him was violated when the State’s *113 bloodstain pattern expert testified based upon tape measurements taken by another law enforcement officer. As this Court has explained, “testimonial hearsay that is introduced against a defendant violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior meaningful opportunity to cross-examine that witness.” State v. Johnson, 982 So.2d 672, 675 (Fla.2008) (citing Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). However, here, the officer who took the tape measurements at issue testified at trial and was actually cross-examined by defense counsel. Therefore, Serrano’s claim that he was denied the opportunity to confront this witness is without merit.

(7) Cross-Examination of Character Witnesses

During the Spencer hearing, several character witnesses testified for the defense. On cross-examination, the prosecution attempted to impeach these witnesses by inquiring as to whether their opinion of Serrano’s character would change if they knew he had molested his fifteen-year-old daughter. Serrano’s daughter had filed a police report about the incident, but Serrano had never actually been charged with a crime.
In Poole v. State, 997 So.2d 382, 393 (Fla.2008), this Court explained that “the State cannot introduce inadmissible non-statutory aggravation under the guise of impeachment.” See also Hitchcock v. State, 673 So.2d 859, 861 (Fla.1996) (“[T]he State is not permitted to present evidence of a defendant’s criminal history, which constitutes inadmissible nonstatutory aggravation, under the pretense that it is being admitted for some other purpose.”). Nevertheless, we deny this claim because any error was harmless beyond a reasonable doubt as there is no reasonable possibility that Serrano was prejudiced by the prosecution’s questioning. See generally Eaglin v. State, 19 So.3d 935 (Fla.2009).
Serrano contends that these cross-examinations took place in front of the jury, that they were a guise for introducing testimony of an unverified collateral crime, and therefore the cross-examinations were unduly prejudicial to him because they affected the jury’s weighing whether to recommend a sentence of death. However, the cross-examinations of Maria Serrano, Alfredo Luna, and Serrano’s son took place during the Spencer hearing, not during the penalty phase. Because the jury was not present at the Spencer hearing, there is no possibility that this questioning affected the jury’s decision whether to recommend sentencing Serrano to death.
Furthermore, it is clear from the trial court’s sentencing order that the trial judge was not influenced by the prosecution’s line of questioning. Nothing regarding any prior bad acts is even alluded to in the sentencing order. To the contrary, in the trial court’s sentencing order, the trial court found that Serrano had no prior criminal history, that he had a good social history, and that he was a good husband and a good father. The trial court would not have stated that Serrano “was a good father in that he loved and cared for his children and they for him” if it had been influenced by the line of questioning put forth by the prosecution.
Accordingly, any error was harmless beyond a reasonable doubt.

(8) Avoid Arrest Aggravator

Serrano contends that the trial court erred when finding the avoid arrest aggravating circumstance with regard to the murder of Diane Patisso. We disagree.
“[I]t is not this Court’s function to reweigh the evidence to determine *114 whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.” Willacy v. State, 696 So.2d 693, 695 (Fla.1997). Rather, “[i]n reviewing an aggravating factor challenged on appeal, this Court’s task ‘is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and, if so, whether competent substantial evidence supports its finding.’” Hernandez v. State, 4 So.3d 642, 667 (Fla.2009) (quoting Douglas v. State, 878 So.2d 1246, 1260-61 (Fla.2004)). In order to establish the avoid arrest aggravator “where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Id. at 667 (quoting Connor v. State, 803 So.2d 598, 610 (Fla.2001)). “In such cases, proof of the intent to avoid arrest or detection must be very strong.” Id. (citing Riley v. State, 366 So.2d 19, 22 (Fla.1978)).
“[T]his Court has approved the finding [of the avoid arrest aggravator] based on circumstantial evidence, without any direct statements by the defendant indicating a motive to eliminate witnesses.” Id. at 667 (citing Swafford v. State, 533 So.2d 270, 276 (Fla.1988)). “[E]ven without direct evidence of the offender’s thought processes, the arrest avoidance aggravator can be supported by circumstantial evidence through inference from the facts shown.” Id. (quoting Swafford, 533 So.2d at 276 n. 6). Circumstantial evidence generally relied upon to prove this aggravator includes “whether the victim knew and could identify the killer and ‘whether the defendant used gloves, wore a mask, or made incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.’ ” Id. (quoting Farina v. State, 801 So.2d 44, 54 (Fla.2001)).
Here, although it is circumstantial, competent substantial evidence in the record supports that the murder of Diane Patisso was committed to avoid arrest. First, according to the statement Serrano gave to law enforcement, Diane Patisso was personally known to Serrano. Therefore, Diane Patisso would have been able to identify him as the person who killed George Gonsalves, Frank Dosso, and George Pa-tisso. Second, Serrano made comments to detectives indicating that Diane Patisso probably walked into the middle of something. In other words, Serrano speculated that Diane Patisso was not the target of the crime, but rather a witness who had to be eliminated. Third, the record does not indicate that Diane Patisso offered any resistance or that she was in any position to pose a threat to Serrano. Therefore, it was not necessary for Serrano to kill Diane Patisso in order to complete his crime. Instead, the only possible motive for killing Diane Patisso was to avoid arrest. Indeed, the circumstances of this crime indicate an elaborate plan to commit a capital crime and avoid being caught. Therefore, we conclude that the trial court did not err in finding the avoid arrest aggravator.

(9) Constitutional Claims

In order to preserve the issues, Serrano submitted various constitutional claims regarding his death sentences. However, this Court has repeatedly rejected arguments that Florida’s capital sentencing scheme is unconstitutional. See, e.g., Bottoson v. Moore, 833 So.2d 693 (Fla.2002); King v. Moore, 831 So.2d 143 (Fla.2002). In fact, this Court need not even address Serrano’s Ring[4] claims because the trial *115 court found the aggravating circumstance of prior violent felony for the contemporaneous murders. See Doorbal v. State, 837 So.2d 940, 963 (Fla.2003).
Additionally, this Court has repeatedly upheld the constitutionality of Florida’s lethal injection procedures. See Power v. State, 992 So.2d 218, 221 (Fla.2008); Sexton v. State, 997 So.2d 1073, 1089 (Fla. 2008); Henyard v. State, 992 So.2d 120, 130 (Fla.2008); Woodel v. State, 985 So.2d 524, 533-534 (Fla.2008); Tompkins v. State, 994 So.2d 1072, 1081 (Fla.2008); Lightbourne v. McCollum, 969 So.2d 326, 353 (Fla.2007); Schwab v. State, 969 So.2d 318, 325 (Fla.2007). And this Court has previously rejected challenges to this Court’s proportionality review. See Hunter v. State, 8 So.3d 1052, 1073 (Fla.2008). This Court has also rejected the claim that the jury instructions unconstitutionally shift the burden of proof. See Schoenwetter v. State, 931 So.2d 857, 876-77 (Fla. 2006).
Accordingly, we reject Serrano’s constitutional arguments that were submitted for preservation purposes.

(10) Proportionality

This Court performs a proportionality analysis in death cases to prevent the imposition of unusual punishments under the constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). “The death penalty is reserved ‘for the most aggravated and unmitigated of most serious crimes.’ ” Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). “Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances.” Blake v. State, 972 So.2d 839, 846 (Fla.2007) (quoting Connor, 803 So.2d at 612). Instead, in deciding whether death is a proportionate penalty, the Court considers the totality of the circumstances of the case and compares the case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998).
Here, Serrano was convicted of killing multiple people in a premeditated, execution-style manner. Following the Spencer hearing, the trial court concluded that the aggravating circumstances of cold, calculated, and premeditated (CCP) and prior capital felony applied to all four murders and that the additional aggravating circumstance of avoid arrest applied to the murder of Diane Patisso. The trial court also found the following statutory mitigating factors: (1) Serrano had no significant history of prior violent activity (great weight); and (2) his age (fifty-nine) at the time of the crime (moderate weight). In addition, the trial court considered thirteen nonstatutory mitigating factors, giving each of them slight to moderate weight.
This Court has found the death penalty proportionate in cases where the totality of the circumstances is similar to the totality of the circumstances here. See, e.g., Wright v. State, 19 So.3d 277 (Fla.2009) (death sentence proportionate where victims were shot execution-style and aggravating circumstances included previous conviction of another capital felony, CCP, and avoid arrest and the statutory mitigating circumstances were that the offense was committed under extreme mental or emotional disturbance, impaired capacity to appreciate the criminality of conduct or conform conduct to the requirements of the law and defendant’s age at the time of the crime; and the trial court found nine nonstatutory mitigating factors); Taylor v. State, 937 So.2d 590 (Fla.2006) (death sentence proportionate where the aggravating circumstances were that defendant was on felony probation at the time of the crime, had committed a prior violent felony, and committed the murder for pecuniary gain and the trial court considered thirteen nonstatutory mitigating circumstances *116 such as employment history, substance abuse, and childhood abuse); Lynch v. State, 841 So.2d 362 (Fla.2003) (death sentence proportionate for double murders where the aggravating factors were CCP for one of the victims, heinous, atrocious, or cruel (HAC) for the other victim, prior violent felony, and commission in the course of another felony and the trial court considered mitigating circumstances of mental disturbance, remorse, substance abuse, and childhood abuse); Pagan v. State, 830 So.2d 792 (Fla.2002) (death sentence proportionate where prior violent felony, commission in the course of armed robbery, and CCP aggravators applied and one statutory and several nonstatutory mitigating circumstances existed); Morton v. State, 789 So.2d 324 (Fla.2001) (death sentence proportionate for double murder with commission during robbery, avoid arrest, and CCP aggravators for both murders and HAC and prior felony conviction for second murder and where trial court considered mitigating circumstances of defendant’s age, lack of prior criminal history, cooperation with police, and difficult family history). Accordingly, we conclude that the death penalty is proportionate here.
CONCLUSION
For the foregoing reasons, we affirm Serrano’s convictions for first-degree murder and his sentences of death.
It is so ordered.
CANADY, C.J., and LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs in result.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Spencer v. State, 615 So.2d 688 (Fla. 1993).

. The Eleventh Circuit Court of Appeals has "refused to recognize ... the second circuit's exception to the Ker-Frisbie doctrine in cases of extreme governmental misconduct.” United States v. Matta, 937 F.2d 567, 568 (11th Cir.1991) (footnotes omitted) (rejecting defendant's claim that court lacked jurisdiction because he was illegally kidnapped from Honduras and tortured before transport to the United States). Moreover, other circuits have expressed doubts regarding the validity of the Second Circuit’s exception in light of subsequent decisions by the United States Supreme Court. See, e.g., United States v. Best, 304 F.3d 308, 313 (3d Cir.2002); United States v. Matta-Ballesteros, 71 F.3d 754, 763 (9th Cir.1995); United States v. Mitchell, 957 F.2d 465, 470 (7th Cir.1992); United States v. Postal, 589 F.2d 862, 874 n. 17 (5th Cir.1979).

. Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).