# Supreme Court of Florida

_____

No. SC15-258
_____

**NELSON SERRANO,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC15-2005
_____

**NELSON SERRANO,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[May 11, 2017]

PER CURIAM.

Nelson Serrano appeals the denial of his postconviction motion filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus.[1]  For the following reasons, we affirm the denial of his guilt phase

postconviction claims, deny his habeas petition, but vacate his sentences, and

remand for a new penalty phase.

## I. BACKGROUND

In 2011, this Court affirmed Serrano's four convictions for first-degree

murder and his four death sentences.  Serrano v. State, 64 So. 3d 93 (Fla. 2011).

This Court explained the background of the case and murders as follows:

> On May 17, 2001, Nelson Serrano was indicted under seal on
> four counts of first-degree murder for the deaths of George Gonsalves,
> Frank Dosso, Diane Patisso, and George Patisso.  The murders
> occurred on December 3, 1997, at Erie Manufacturing and Garment
> Conveyor Systems in Bartow.  George Gonsalves was one of
> Serrano's business partners.  And Frank Dosso, Diane Patisso, and
> George Patisso were respectively the son, daughter, and son-in-law of
> Serrano's other business partner, Felice (Phil) Dosso.  Serrano, a dual
> citizen of the United States and Ecuador, was arrested in Ecuador on
> August 31, 2002, and brought to the United States.
>
> At the guilt phase, which occurred in 2006, the State presented
> the following evidence.  In the 1960s, Phil Dosso and George
> Gonsalves started a tool and die business, Erie Manufacturing
> Cooperative, in New York.  Their business provided parts to support
> the garment industry.  In the 1980s, Phil Dosso and George Gonsalves
> met Nelson Serrano, who was working for a New Jersey company
> selling slick rail systems for the garment industry.  In the middle of
> the 1980s, the three men created a separate company, Garment
> Conveyor Systems.  Serrano was responsible for designing, selling,
> and installing slick rail systems, while Dosso and Gonsalves built the
> parts.

---

1. We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  Because we
are remanding for a new penalty phase, we do not address Serrano's penalty phase
claims.

In the late 1980s, the partners moved the business to Bartow, Florida. At that time, they closed Erie Manufacturing Cooperative and transferred all the assets to Erie Manufacturing, Inc. As part of their oral agreement, Serrano bought into the Erie partnership and agreed to pay Phil Dosso and George Gonsalves $75,000 each. Therefore, all three men were equal partners in both Garment Conveyor Systems and Erie Manufacturing. Garment moved to Bartow as well. Serrano's son, Francisco Serrano, began working at the business soon after they relocated to Bartow, and Phil Dosso's son, Frank Dosso, began working there at a later date. Phil Dosso's son-in-law, George Patisso, was also an employee of the business.

By the early 1990s, the business was doing well. However, friction between the three partners had developed. Nelson Serrano had failed to pay the $75,000 to each of his partners. Further, there were disagreements about the distribution of assets and accusations that there were two sets of books. Then, in the summer of 1997, Phil Dosso and George Gonsalves fired Francisco Serrano. Also in the summer of 1997, Nelson Serrano opened a separate business checking account with a different bank and deposited two Erie checks totaling over $200,000. And Serrano instituted a civil suit against his partners. Ultimately, Serrano was removed as president by a vote of the other two partners, and the locks were changed on the building.

Numerous Erie employees testified to the strained relations between Serrano and the other two partners, particularly Serrano's dislike of Gonsalves. Serrano made statements indicating that he wished Gonsalves were deceased. Additionally, Phil Dosso testified to hearing Serrano state that he felt like killing Gonsalves.

On the evening of the murders, most Erie employees left work at 5 p.m. or shortly thereafter. However, as was his usual practice, George Gonsalves worked late. David Catalan, an employee at Erie, testified that when he left with another employee shortly after 5 p.m. George Gonsalves' car was the only car in the parking lot. Although George Patisso and Frank Dosso remained at Erie with Gonsalves, they did not have a car parked in front because George Patisso's wife, Diane Patisso, had plans to pick them up and take them to Frank Dosso's home for a family birthday party.

When family members began calling Frank Dosso and could not get an answer, Phil Dosso and his wife decided to drive to Erie. As Phil and Nicoletta Dosso entered Erie's unlocked front door, they discovered the deceased body of their daughter, Diane Patisso. Phil

Dosso called 911 and ran to Frank Dosso's office, where he discovered the bodies of George Gonsalves, George Patisso, and Frank Dosso.

When the first law enforcement officers arrived at the scene at 7:36 p.m., there were only three cars parked in front of the entrance: Phil Dosso's car, Diane Patisso's car, and George Gonsalves' car. Inside Erie, law enforcement discovered twelve shell casings, eleven from a .22 and one from a .32. All of the victims had been shot in the head with .22 bullets, and Diane Patisso was also shot once with a .32 bullet. The three men were shot execution-style. While neither murder weapon was ever located, the State introduced evidence that Serrano possessed and owned multiple .22 and .32 caliber firearms.

In the office containing the three male victims, officers discovered a blue vinyl chair with shoe impressions on the seat. Directly above the chair, a ceiling tile had been dislodged. Although this office was Frank Dosso's office at the time of the murders, it had been Nelson Serrano's office when he worked at Erie. David Catalan testified that on one occasion, he saw Serrano in his office with a gun. Serrano was standing on a chair, moving a ceiling tile, and taking papers out of the ceiling. Further, Erie employee Velma Ellis testified that the blue chair in Frank Dosso's office was never used and always remained under a desk in the office and that there were papers and a box piled on top of the chair's seat. Ellis testified that the chair was in its usual position under the desk when she left work on December 3, 1997, at 5 p.m. Crime analysts tested the shoe impressions on the dusty seat of the blue vinyl chair and found that the class characteristics and wear pattern were consistent with a pair of shoes Serrano owned and later loaned to a nephew.

The State's theory at trial was that Serrano kept a .32 caliber firearm hidden in the ceiling of his office. Once he was ousted from the company and the locks were changed he was unable to retrieve the gun until the night of the murders. After Serrano had shot the three male victims in his former office and was leaving the scene, Diane Patisso entered the building and was shot with both a .22 and the retrieved .32. An FDLE agent testified that Serrano told the agent that he would hide a gun in the ceiling of his office when he was out of town on business. However, Serrano's fingerprints and DNA were not discovered at the crime scene.

When officers first discovered the four victims at Erie, their investigation immediately focused on Serrano. As soon as Serrano

returned to his home from a business trip to Atlanta on December 4, 1997, detectives requested that he come to the police station for an interview. At the police station, Serrano told law enforcement about his problems with his partners and explained to the detective that he had learned of the murders the previous evening when he had called his wife from his Atlanta hotel.

During his interview with law enforcement, Serrano detailed his business trip itinerary, which included leaving Lakeland early on the morning of December 2, flying from Orlando to Washington, D.C., and, on the evening of December 2, flying from Washington to Atlanta. Serrano indicated that he remained in Atlanta until December 4, 1997. When asked by the detective what he thought may have happened at Erie, Serrano replied that "somebody is getting even; somebody they cheated, and George is capable of that." Thereafter, the detective took Serrano's taped statement, which was played for the jury. During his taped statement, Serrano stated that maybe Diane Patisso "walked in the middle of something."

Officers traveled to Atlanta to investigate Serrano's alibi and met with Larry Heflin of Astechnologies regarding his business meeting with Serrano. Heflin testified that he met Serrano in Atlanta on December 3 at about 9:45 a.m., and the meeting lasted approximately one hour. Investigators also obtained the La Quinta Inn airport hotel's surveillance videotapes. The video showed Serrano in the Atlanta hotel lobby at 12:19 p.m. on December 3. Ten hours later, at 10:17 p.m., Serrano was again seen on the video, entering the hotel lobby from the outside, wearing the same sweater and jacket as earlier in the afternoon.

Alvaro Penaherrera, Serrano's nephew, testified that on two separate occasions Serrano asked Penaherrera to rent a car for him so that Serrano's wife would not find out about the rentals. On October 29, 1997, Serrano drove Penaherrera to the Orlando airport, where Penaherrera picked up a rental car. Penaherrera then drove the car and left it at a nearby valet lot. Thereafter, Serrano drove Penaherrera back to his apartment. Penaherrera had no further contact with the rental car and did not know who returned it on October 31, 1997, at 7:30 p.m.

Around Thanksgiving 1997, Serrano again asked Penaherrera to rent a car for him under Penaherrera's name because Serrano had a girlfriend from Brazil coming into town. On November 23, 1997, Penaherrera made a telephone reservation for a rental car for

December 3, 1997. On December 3, 1997, at 7:53 a.m., Serrano called Penaherrera from Atlanta and asked him to call to confirm the rental car reservation. Serrano called Penaherrera back at 8:06 a.m. to verify that the rental car would be ready. Penaherrera then drove to Orlando's airport and parked his car in the parking garage, rented the car from the terminal dealership, and drove the rental car back to the Orlando airport parking garage, where he left it as his uncle requested. Later that day, Serrano called Penaherrera, and Penaherrera told Serrano where the car was located and where the keys were hidden.

As on the previous occasion in October, Penaherrera did not expect to have any further involvement with the rental car after he left it at the Orlando airport parking garage on December 3. However, Serrano called Penaherrera the next day, December 4, to tell Penaherrera that the rental car was in Tampa, not Orlando, and that Penaherrera needed to drive to Tampa and return the car there. Serrano told Penaherrera if he went to Tampa and returned the car, Serrano would pay off Penaherrera's credit card bill and Penaherrera could pay him back without interest. Penaherrera agreed to this arrangement and returned the rental car in Tampa at 2:10 p.m. on December 4, 1997. Gustavo Concha, Serrano's friend and Penaherrera's godfather, subsequently paid Penaherrera's Visa bill.

Penaherrera next saw Serrano when he was visiting relatives in Ecuador for Christmas of 1997. Serrano informed Penaherrera of the murders at Erie and told Penaherrera that he could not say anything about the rental cars because it would jeopardize his marriage and the police would frame him for the murders.

In June 2000, Penaherrera, his girlfriend, and his brother were subpoenaed to testify before the grand jury. The three spent the night at Serrano's house the night before their testimony. That night Serrano asked Penaherrera to tell the grand jury that he had rented the car for a friend with whom he had subsequently lost contact. Serrano also gave Penaherrera and his brother suits and dress shoes to wear to court. The pair of shoes that Serrano gave Penaherrera were seized by law enforcement, and subsequent testing indicated that the right shoe was consistent with the impression on the seat of the blue chair at the murder scene.

Also in June 2000, Penaherrera spoke for the first time with law enforcement regarding the December 1997 rental car transaction. And after his testimony and discussions with law enforcement, Penaherrera returned home to Orlando, where Serrano contacted him to find out

what information he had given to the grand jury and law enforcement. After Penaherrera testified before the grand jury, Serrano sold his home, car, and other assets and moved to Ecuador.

The State introduced evidence regarding Serrano's air travel for his December 1997 business trip. As explained previously, Serrano flew from Orlando to Washington, D.C., and then to Atlanta, on December 2, 1997. However, contrary to his statements to law enforcement, the State also introduced evidence that Serrano traveled back to Florida on the day of the murders using two aliases. The State theorized that on the day of the murders Serrano flew from Atlanta to Orlando under the name Juan Agacio. Serrano then drove the car rented by Penaherrera on December 3 from the Orlando airport to Bartow, where he killed the four victims. Thereafter, he immediately drove the rental car to the Tampa airport, where he departed on a flight back to Atlanta using the alias John White.

To support its theory and timeline of Serrano's activities on the day of the murders, the State introduced the videotape evidence demonstrating that Serrano was in the La Quinta Inn's lobby in Atlanta shortly after noon on December 3, 1997. According to Serrano, he returned to his hotel room for the next ten hours because he was suffering from a migraine headache. However, the State introduced evidence that at 1:36 p.m. on December 3 a passenger calling himself Juan Agacio boarded Delta flight 1807 in Atlanta, scheduled to depart at 1:41 p.m. for Orlando. At 3:05 p.m., the passenger purporting to be Juan Agacio arrived in Orlando on flight 1807, and at 3:49 p.m., the rental car that Penaherrera had rented exited the Orlando parking garage.

Serrano's fingerprint was located on the parking garage ticket, indicating that Serrano departed from the Orlando airport garage at 3:49 p.m. on December 3, 1997. And Serrano has a son, who was named Juan Carlos Serrano at birth and whose mother's maiden name is Gladys Agacio. Additionally, the round-trip ticket for the Atlanta–to–Orlando flight of the passenger flying under the name Juan Agacio was purchased with cash at the Orlando airport on November 23, 1997, which is the same date that Penaherrera reserved the rental car for December 3, 1997. The State also introduced evidence that Serrano's vehicle left the Orlando airport's parking garage about twenty minutes after the passenger traveling under the name Juan Agacio purchased his ticket. The return portion of the flight was never used.

At approximately 5:30 p.m. on December 3, 1997, a person was seen standing off the side of the road near Erie's building. When John Purvis left work on December 3, 1997, he noticed the man wearing a suit standing in the grassy area with no car in the vicinity. The man was holding his coat and hands in front of his face as if he were lighting a cigarette. Both Alvaro Penaherrera and Maureen Serrano testified that Serrano smoked, but they did not testify that he specifically smoked cigarettes. Purvis described the man, and law enforcement made a composite sketch that was shown to the jury.

Approximately two hours after the murders, at 7:28 p.m., the passenger flying under the name John White arrived at Tampa International Airport and checked into Delta Airlines for flight 1272 to Atlanta. Similar to the purchasing process for the ticket in the name of Juan Agacio, the purchaser paid for a round-trip ticket at Tampa International Airport on November 23, 1997, and never used the return portion of the ticket. Flight 1272 was scheduled to arrive in Atlanta at 9:41 p.m.

At 10:17 p.m., Serrano was observed in Atlanta on videotape walking into the La Quinta Inn airport hotel lobby from the outside, wearing the same clothes he had been wearing ten hours earlier. After being observed in the hotel lobby, Serrano used his cell phone to call various individuals, including his wife. The next morning he made multiple calls to Alvaro Penaherrera telling him he had to return the rental car that was now located at Tampa airport.

Furthermore, the State presented evidence that the car rented by Penaherrera on December 3 had been driven 139 miles. The distance from the Orlando airport to Erie is eighty miles, and the distance from Erie to the Tampa airport is fifty miles, totaling 130 miles.

While incarcerated awaiting trial, Serrano spoke to fellow inmate and "jailhouse lawyer," Leslie Todd Jones, about his case. Serrano denied any involvement in the murders, telling Jones that he believed a mafia hitman may have committed the murders, or alternatively, that Frank Dosso wanted to take over the business from George Gonsalves. The main theory Serrano described involved a hitman Serrano knew only as John, who was owed a substantial amount of money by the Dosso and Gonsalves families. Serrano explained to Jones that he and the hitman drove to the airports in Tampa and Orlando and that John purchased tickets under the names of Todd White and Juan Agacio. Serrano told Jones that the hitman had planned to approach the business partners on Halloween night,

but it was raining and the business was closed. Serrano also told Jones about his fingerprint being found on a parking ticket in Orlando, but Serrano claimed that an FDLE agent had planted his fingerprint.

After law enforcement learned about the Halloween incident from inmate Jones, they began investigating and discovered almost an identical pattern of travel as the travel surrounding the December 3, 1997, murders. Serrano once again was traveling on a business trip from Orlando to Charlotte from October 30 to November 2, 1997. And as previously discussed, on October 29, Serrano took Alvaro Penaherrera to the Orlando airport, where Penaherrera rented a car for Serrano and left it at a nearby valet lot. The next morning, October 30, 1997, Serrano flew from Orlando to Charlotte with his flight arriving in Charlotte at 8:34 a.m. The following day, Halloween, someone traveling under the name Juan Agacio took a flight departing from Charlotte at 1:40 p.m. and arriving in Orlando at 3:07 p.m. At 7:30 p.m., a passenger identified as John White was scheduled to depart on a flight from Tampa to Charlotte.

During the guilt phase, the defense maintained that Serrano had been in an Atlanta hotel room with a migraine at the time of the murders. The defense emphasized that no forensic evidence linked Serrano to the scene of the crimes. The defense also pointed out that there was evidence of robbery at the scene as several offices were in disarray, Frank Dosso's Rolex watch was missing, and George Patisso's gold chain was missing. However, the jury returned a verdict finding Serrano guilty on four counts of first-degree murder.

At the penalty phase, the State presented victim impact statements, and the parties stipulated that Serrano was fifty-nine years of age at the time of the murders and that Serrano had no prior criminal history. The defense presented evidence that Serrano never received any disciplinary reports while incarcerated awaiting trial. The jury recommended a sentence of death by a vote of nine to three for each of the four murder counts.

At the Spencer hearing, Serrano presented numerous witnesses, some of whom testified by videotape from Ecuador. Then, on June 26, 2007, the trial court sentenced Serrano to death for each of the four murders.

Id. at 98-103 (footnote omitted).[2]

On direct appeal, this Court affirmed Serrano's convictions and sentences, rejecting the nine issues raised by Serrano and finding the death sentences proportionate.[3]

---

2. "The trial court found the following aggravators in regards to all four murders: (1) the murders were committed in a cold, calculated, and premeditated manner (great weight); and (2) Serrano was convicted of other capital felonies (the contemporaneous murders) (great weight). The trial court also found that the murder of Diane Patisso was committed for the purpose of avoiding arrest (great weight). Additionally, the trial court found the following mitigators: (1) Serrano had no significant history of prior criminal activity (great weight); (2) Serrano was in his late fifties at the time of the crimes (some moderate weight); (3) Serrano performed well in school (moderate weight); (4) Serrano has a good social history (moderate weight); (5) Serrano had no history of drug or alcohol abuse (some weight); (6) Serrano was a successful Hispanic immigrant (moderate weight); (7) Serrano displayed positive behavior during his pretrial incarceration (some weight); (8) Serrano displayed positive behavior during his court appearances (some weight); (9) Serrano expressed remorse regarding the death of Diane Patisso (slight weight); (10) Serrano had a good employment history (some weight); (11) Serrano was a good husband (some weight); (12) he was a good father (some weight); (13) Serrano was positively involved in his religion (some weight); and (14) he had a significant history of good works (moderate weight)." Serrano, 64 So. 3d at 103.

3. Serrano raised the following on direct appeal: "(1) whether the circumstantial evidence is sufficient to support his convictions; (2) whether Serrano's statements to FDLE Agent Tommy Ray were admissible; (3) whether the trial court properly denied Serrano's motions to dismiss the indictment and divest itself of jurisdiction; (4) whether the prosecutor engaged in misconduct that entitles Serrano to relief; (5) whether the trial court properly denied Serrano's motion for a change of venue; (6) whether the testimony of the State's bloodstain pattern expert was admissible; (7) whether the State improperly cross-examined Serrano's character witnesses about collateral crimes at the Spencer hearing; (8) whether the

Thereafter, Serrano filed a motion for postconviction relief and several amendments. During postconviction proceedings, Serrano obtained STR DNA testing of a plastic glove discovered at the crime scene under Diane Patisso's body as well as STR DNA testing of two cigarette butts located in Erie's parking lot. Serrano also obtained a postconviction order requiring fingerprint comparisons of several unknown fingerprints discovered at the crime scene, but the postconviction claim relating to the fingerprints was withdrawn after Serrano's fingerprint was subsequently identified on a piece of paper that had been discovered near one of the victim's body.

After holding an evidentiary hearing in May 2014, the trial court denied Serrano's motion for postconviction relief. This appeal and habeas petition followed.

## I. ANALYSIS

### A. Letters

Serrano alleges that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose a cover letter accompanying the United States' extradition request, which indicated that the death penalty would not be sought if Serrano were extradited from Ecuador, and by failing to disclose a letter received

---

avoid arrest aggravator was properly submitted to the jury and found by the trial court; and (9) whether Serrano's death sentence is constitutional." Id. at 104.

by the state attorney from the Ecuadorian Consul, which expressed Ecuador's displeasure with the potential imposition of the death penalty. However, we affirm the denial of this claim.

"Under Brady, the State must disclose to the defense knowledge of material exculpatory or impeachment evidence." Jones v. State, 998 So. 2d 573, 579 (Fla. 2008). As this Court has explained,

> [t]o demonstrate a Brady violation the defendant must prove that (1) the evidence is favorable to him, either because it is exculpatory or because it is impeaching; (2) the State willfully or inadvertently suppressed it; and (3) that the suppression resulted in prejudice. Evidence is prejudicial or material under Brady if there is a reasonable probability that had the evidence been disclosed, the result of the trial would have been different. United States v. Bagley, 473 U.S. 667, 678 (1985). Thus, the critical question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Strickler v. Greene, 527 U.S. 263, 290 (1999) (quoting Kyles[ v. Whitley, 514 U.S. 419, 435 (1995)]).

Id. at 579-80. "Questions of whether evidence is exculpatory or impeaching and whether the State suppressed evidence are questions of fact, and the trial court's determinations of such questions will not be disturbed if they are supported by competent, substantial evidence." Taylor v. State, 62 So. 3d 1101, 1114 (Fla. 2011). For Brady claims, "the defendant ultimately carries the burden of establishing a prima facie case based upon a legally valid claim." Id. at 1115.

Here, Serrano failed to demonstrate that the extradition packet cover letter and the Ecuadorian Consul's letter constitute Brady material. The promise that the

death penalty would not be sought if Ecuador extradited Serrano, which Ecuador did not do, is not favorable to Serrano as exculpatory or impeachment evidence. The Ecuadorian Consul's letter expressing Ecuador's opposition to the death penalty also does not constitute exculpatory or impeachment evidence. As such, Serrano's Brady claim is without merit. See Hurst v. State, 18 So. 3d 975, 1003 (Fla. 2009) ("The State's failure to disclose the notes regarding Hess is not a Brady violation because the notes are not exculpatory or impeaching and do not provide any basis to undermine our confidence in the verdict.").

**B. Closing Argument**

Next, Serrano claims that trial counsel was ineffective for failing to object to portions of the State's closing argument in the guilt phase, namely the State's description of Serrano as diabolical and a liar, the State's comments that allegedly shifted the burden of proof, and the State's discussion of the presumption of innocence. However, because Serrano failed to establish prejudice, this Court affirms the denial of relief.

Following the United State Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court has explained that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be

demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency prong of Strickland, there is a strong presumption that trial counsel's performance was not ineffective. Strickland, 466 U.S. at 690. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Further, the defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). And counsel cannot be deemed ineffective for failing to make a meritless argument. Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992), abrogated on other grounds by Deren v. State, 985 So. 2d 1087 (Fla. 2008).

"Regarding the prejudice prong of Strickland, the defendant must show that there is a reasonable probability that, 'absent the [deficient performance], the factfinder would have [had] a reasonable doubt respecting guilt.' " Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012) (quoting Strickland, 466 U.S. at 695). "A

- 14 -

reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Id. (quoting Strickland, 466 U.S. at 694).

"Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo." Dennis, 109 So. 3d at 690.

On direct appeal, "Serrano allege[d] that the State improperly called Serrano diabolical and a liar during closing arguments." Serrano, 64 So. 3d at 111. Serrano also alleged on direct appeal "that the State improperly shifted the burden of proof by stating the following during closing arguments: (1) 'You can't come up with any other theory that fits that anybody else would have done it;' (2) 'He talks about this being a professional hit. There is no evidence. There is no evidence that these crimes are any kind of professional hit.' " Id. This Court rejected both claims, explaining that they were not preserved for appellate review by contemporaneous objections. Id. Additionally, with both claims, this Court concluded that, if there was error, the error did not constitute fundamental error. Id. Therefore, "[b]ecause [Serrano] could not show the comments were fundamental error on direct appeal, he likewise cannot show that trial counsel's failure to object to the comments resulted in prejudice sufficient to undermine the outcome of the case under the prejudice prong of the Strickland test." Chandler v.

- 15 -

State, 848 So. 2d 1031, 1046 (Fla. 2003); see also Thompson v. State, 759 So. 2d 650, 664 (Fla. 2000) ("Because none of these prosecutorial comments would have constituted reversible error had they been objected to at trial, we affirm the trial court ruling summarily denying this claim.").

Regarding the State's discussion of the presumption of innocence during closing argument, Serrano also cannot demonstrate prejudice. Even if the State's brief discussion was erroneous, the jury was properly instructed about the presumption of innocence by the trial judge. And the trial judge instructed the jury that it must follow the law as set out in the jury instructions. Moreover, as the postconviction court explained in its order denying relief, the State's comments when read in their entirety appear to be an attempt to argue that the State had met its burden of proof in the case through the presentation of evidence. Cf. Taylor v. State, 62 So. 3d at 1113 (concluding that comments "the presumption of innocence does not leave the defendant until evidence has been presented that wipes away that presumption" and that "[t]here is no longer a presumption of innocence as evidence has been presented" were not improper but were an attempt to state the belief that the State satisfied the burden of proof). As a result, there is not a reasonable probability of a different result. In other words, our confidence in the outcome is not undermined.

Accordingly, we affirm the denial of this claim.

## C. Travel Timeline

Serrano also asserts that trial counsel was ineffective in failing to investigate and present evidence calling into question the State's timeline for Serrano's travel between Atlanta, Orlando, Bartow, Tampa, and back to Atlanta on the day of the murders. However, we affirm the postconviction court's denial of this claim.

First, Serrano has failed to demonstrate deficiency. Trial counsel Norgard testified at the postconviction evidentiary hearing that he closely reviewed the alleged travel timeline and that, after considering his personal experiences traveling in these locations as well as comparing the timeline with others' personal experiences, he believed the timeline was tight, but "doable." And trial counsel strenuously argued to the jury at trial that the State's timeline was very improbable, if not impossible. Serrano has not demonstrated that this investigation and strategy regarding the travel timeline was unreasonable. See generally Atkins v. Dugger, 541 So. 2d 1165, 1166 (Fla. 1989) ("One tactic available to counsel is to present expert testimony. However, it is by no means the only tactic, nor is it required.").

Second, Serrano has failed to demonstrate prejudice. During the postconviction proceedings, Serrano never introduced any evidence indicating that a more complete investigation into the timeline or hiring an individual to reenact the timeline would have changed Serrano's defense at trial or would have further called the State's timeline into question. Cf. Conahan v. State, 118 So. 3d 718,

727-28 (Fla. 2013) (holding that the defendant could not establish prejudice for trial counsel's failure to hire an expert when the expert's testimony would not have changed the nature of the State's evidence). Thus, Serrano has failed to establish a reasonable probability of a different result. In other words, our confidence in the outcome is not undermined.

Accordingly, this Court affirms the denial of this claim.

## D. Law Enforcement Testimony

Serrano next claims that trial counsel was ineffective for failing to object to law enforcement's testimony during the guilt phase and the prosecutor's comment during opening statement that the police did not believe the crime was motivated by robbery. However, this Court affirms the denial of relief.

First, the admission of this testimony and the prosecutor's comment about the testimony were not improper. Evidence of a defendant's motive and testimony about the course of law enforcement's investigation are admissible. See generally Craig v. State, 510 So. 2d 857, 863 (Fla. 1987) ("While evidence of motive is not necessary to a conviction, when it is available and would help the jury to understand the other evidence presented, it should not be kept from them merely because it reveals the commission of crimes not charged."); Kearse v. State, 662 So. 2d 677, 684 (Fla. 1995) ("We find no error in the admission of Tedder's testimony regarding the transmissions to dispatch or the tape of those

transmissions.  The State did not offer this evidence to prove the truth of the matter asserted, but rather to establish the sequence of events and to explain why the police investigation focused on Kearse as the perpetrator.").  And trial counsel cannot be deemed deficient for failing to make a meritless objection.

Moreover, even if there was any error, Serrano could not demonstrate prejudice.  The jury heard evidence that Serrano himself told law enforcement that he did not believe the murders were motivated by robbery.  Further, trial counsel was not prevented from arguing that robbery might have been the motive based upon the evidence presented by the State that two victims were missing a watch and necklace respectively and that the crime scene was discovered in disarray.  Thus, there is no reasonable probability of a different result had trial counsel objected.  In other words, our confidence in the outcome is not undermined.

Accordingly, we affirm the denial of this claim.

**E.  Shoe Size**

Additionally, Serrano argues that trial counsel was ineffective for failing to present evidence of Serrano's shoe size.  However, we affirm the denial of relief.

Serrano has failed to demonstrate deficiency.  At the evidentiary hearing, trial counsel testified that he decided to not present evidence of Serrano's shoe size in order for the defense to retain first and last closing argument.  Trial counsel stated that he believed the State's presentation of the size 8½ shoes obtained from

Serrano would suffice. Trial counsel's decision was not "outside the broad range of reasonably competent performance under prevailing professional standards." Bolin, 41 So. 3d at 155 (quoting Maxwell, 490 So. 2d at 932).

Furthermore, Serrano has failed to demonstrate prejudice. The investigator hired by postconviction counsel to measure Serrano's feet determined that Serrano wore a size 9 shoe in October 2013. And, while evidence was presented at trial that the shoe Serrano loaned his nephew Alvaro Penaherrera, which was consistent with the shoeprint discovered at the crime scene, is a size 7, evidence was also presented at trial that Serrano loaned his other nephew size 8½ shoes in a different style. See Serrano, 64 So. 3d at 101. Moreover, the State's podiatrist testified at the evidentiary hearing that an individual's shoe size often increases as an individual ages, and the murders in this case took place nearly 16 years before Serrano's feet were sized during postconviction proceedings. Also, the State presented evidence at the evidentiary hearing that the size 7 DeRizzo shoes loaned to Penaherrera that matched the print at the crime scene were almost the exact same size as the size 8½ Bostonian Florentine shoes that Serrano loaned to his other nephew. In fact, the size 7 shoes were only .1 centimeters shorter than the 8½ shoes. Thus, there is no reasonable probability of a different result had trial counsel introduced evidence of Serrano's shoe size. In other words, our confidence in the outcome is not undermined.

Accordingly, we affirm the denial of this claim.

## F. <u>Giglio</u> Claim Regarding John Purvis

Serrano claims that the State, in violation of <u>Giglio v. United States</u>, 405 U.S. 150 (1972), presented false testimony from John Purvis regarding the individual Purvis witnessed standing outside Erie near the time of the murders. However, we affirm the denial of this claim.

"To establish a <u>Giglio</u> violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." <u>Guzman v. State</u>, 868 So. 2d 498, 505 (Fla. 2003). "Under <u>Giglio</u>, once a defendant has established that the prosecutor knowingly presented false testimony at trial, the State bears the burden to show that the false evidence was not material." <u>Id.</u> at 507.

Here, there is competent, substantial evidence to support the postconviction court's factual finding that John Purvis' testimony was not false. <u>See</u> <u>Davis v. State</u>, 136 So. 3d 1169, 1186-87 (Fla. 2014) ("[T]he postconviction court concluded that Williams' deposition testimony was ambiguous and thus did not demonstrate that her trial testimony was false. The postconviction court did not err in denying relief. The postconviction court's factual conclusion that Williams' testimony was not false is supported by competent, substantial evidence."). John Purvis' testimony at trial in 2006 was relatively consistent with his pre-hypnosis

statements to law enforcement in 1999.[4] He testified at trial that the man he saw outside Erie was holding his hands "like he was lighting a cigarette." And, in 1999, Purvis stated that the individual "had pulled his coat up like this and was lighting a cigarette in the wind." Further, both at trial and in his statement to law enforcement in 1999, Purvis described the individual as non-Caucasian and possibly Hispanic with black hair even though Purvis also included the possibility in his statement in 1999 that the non-Caucasian individual might be Hispanic or Asian. However, the slight differences and ambiguities in Purvis' descriptions appear to be the result of the same witness giving multiple statements describing the same thing over time. Serrano has failed to demonstrate that the State presented false testimony.

Additionally, Serrano failed to present any testimony during postconviction proceedings to show the falsity of Purvis' testimony at trial that the pre-hypnosis composite sketch introduced at trial "resemble[d] the person best you could describe it for this artist that you saw outside Erie Manufacturing that day."

---

4. Testimony regarding post-hypnosis statements is inadmissible. See Stokes v. State, 548 So. 2d 188, 196 (Fla. 1989) ("[T]estimony of a witness who has undergone hypnosis for the purpose of refreshing his or her memory of the events at issue is inadmissible as to all additional facts relating to those events from the time of the hypnotic session forward. A witness who has been hypnotized may testify to statements made before the hypnotic session, if they are properly recorded.").

Serrano's argument is based on the assumption that Purvis' second, post-hypnotic composite sketch must be a more reliable reflection of his recollection at trial than the pre-hypnotic composite sketch, but that assumption is not necessarily true. As this Court has explained, "although some experts profess the belief that hypnotically refreshed testimony is reliable, many more experts have arrived at the opposite conclusion." Stokes v. State, 548 So. 2d 188, 194 (Fla. 1989) (footnote omitted) (ruling that additional hypnotically refreshed testimony is inadmissible).

Accordingly, this Court affirms the denial of this Giglio claim.

## G. Ineffective Assistance of Counsel Claim Regarding John Purvis

Next, Serrano alleges that trial counsel was ineffective for failing to object to John Purvis' allegedly false testimony that was presented in violation of Giglio. Serrano also claims that trial counsel was ineffective for failing to depose Purvis, for failing to cross-examine him regarding his pre-hypnosis description of the man he saw outside as being non-Caucasian and possibly Asian or Hispanic and lighting a cigarette, and for failing to seek the admission of Purvis' post-hypnotic statements and composite sketch. However, because Serrano failed to demonstrate deficiency, we affirm the postconviction court's denial of relief.

First, as explained previously, John Purvis' testimony describing the man he saw outside Erie was not false testimony in violation of Giglio. Therefore, trial

counsel cannot be deficient for failing to raise a meritless objection based on Giglio.

Second, Serrano failed to establish that trial counsel was deficient for failing to seek the admission of Purvis' hypnotically refreshed statements and composite sketch. In Stokes, 548 So. 2d at 196, this Court held that "the testimony of a witness who has undergone hypnosis for the purpose of refreshing his or her memory of the events at issue is inadmissible as to all additional facts relating to those events from the time of the hypnotic session forward." However, this Court explained that "[a] witness who has been hypnotized may testify to statements made before the hypnotic session, if they are properly recorded." Id.

Serrano argues that Purvis' hypnotically refreshed statements fall under an exception outlined in the United States Supreme Court's decision in Rock v. Arkansas, 483 U.S. 44 (1987). However, Rock involved hypnotically refreshed statements in the context of a criminal defendant's constitutional right to testify in his or her own defense. Since Purvis was a State witness, not the defendant, Rock is inapplicable here. Consequently, because Purvis' hypnotically refreshed statements and the post-hypnosis composite sketch were inadmissible, trial counsel cannot be deemed deficient for failing to present it. See Owen v. State, 986 So. 2d 534, 546 (Fla. 2008) ("Trial counsel cannot be deemed ineffective for failing to present inadmissible evidence.").

Third, Serrano failed to demonstrate that trial counsel was deficient for failing to depose Purvis and cross-examine him regarding alleged discrepancies in his descriptions of the individual he saw the night of the murders. At the evidentiary hearing, trial counsel explained that he did not want to diminish Purvis' testimony or undermine his credibility because Purvis' description of the individual being 25 to 30 years old was favorable to the defense's case. Serrano was significantly older than the man Purvis described, and trial counsel "were arguing that Mr. Purvis saw somebody other than Mr. Serrano out there[. W]e were trying to convince the jury that he saw who was the killer." Trial counsel's strategic decision was reasonable, and Serrano has failed to demonstrate deficiency under Strickland.

Accordingly, this Court affirms the denial of relief.

## H. DNA Testing

Further, Serrano alleges postconviction STR DNA testing results warrant a new trial and that trial counsel was ineffective for failing to seek STR DNA testing. However, we affirm the denial of both claims.

"This Court has previously held that for a conviction to be set aside based on a claim of newly discovered evidence, the defendant must meet two requirements[:]"

> First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the

- 25 -

defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So. 2d 512, 521 (Fla. 1998) ("Jones II"). Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So. 2d 309, 315 (Fla. 1996)). In determining whether the newly discovered evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Jones v. State, 591 So. 2d 911, 916 (Fla. 1991) ("Jones I").

Spann v. State, 91 So. 3d 812, 815-16 (Fla. 2012). Moreover, this Court has explained that "[w]hen the trial court rules on a newly discovered evidence claim after an evidentiary hearing, we accept the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence if based upon competent, substantial evidence." Waterhouse v. State, 82 So. 3d 84, 101 (Fla. 2012) (quoting Hitchcock v. State, 991 So. 2d 337, 349 (Fla. 2008)).

Here, the second prong of the newly discovered evidence standard is not satisfied. At the evidentiary hearing, all three DNA witnesses testified that Serrano could neither be included nor excluded from the DNA located in the palm of the plastic glove discovered under Diane Patisso's body. And while one of the witnesses testified that Serrano could be excluded as a contributor to the mixture of approximately three people on the glove fingers, the other two experts disagreed. The other two experts, one of whom was even called by Serrano, testified that

there was not enough information using STR technology to either exclude or include Serrano as having contributed to the mixture. All three explained that victim George Patisso was the major contributor to the mixture on the glove fingers. Considering this evidence as well as the evidence presented at trial, it is clear that the inconclusive STR DNA evidence would not probably produce an acquittal on retrial because it does not give rise to a reasonable doubt as to Serrano's culpability.

Additionally, Serrano failed to establish that trial counsel was ineffective for failing to seek this STR DNA testing. At the evidentiary hearing, trial counsel explained that the State had no DNA evidence linking Serrano to the crime scene, and he did not want to risk the possibility of establishing such a link with a defense request for additional DNA testing. Instead, trial counsel chose to stress to the jury that there was no physical evidence demonstrating that Serrano was at Erie the night of the murders. This decision was reasonable and not "outside the broad range of reasonably competent performance under prevailing professional standards." Bolin, 41 So. 3d at 155 (quoting Maxwell, 490 So. 2d at 932). Consequently, Serrano did not establish deficiency.

Serrano also failed to demonstrate prejudice. There is not a reasonable probability of a different result if trial counsel had presented the inconclusive STR DNA testing of the plastic glove. Three experts agreed that the further DNA

testing of the palm of the glove found under one of the four victims could not exclude Serrano, and two of three experts agreed that further DNA testing of the glove fingers could not exclude Serrano. In other words, our confidence in the outcome is not undermined.

Accordingly, this Court affirms the denial of these newly discovered evidence and ineffective assistance of counsel claims.

## I. Motion For New Trial

In his habeas petition, Serrano alleges that appellate counsel was ineffective for failing to assert trial counsel's ineffectiveness on the record for not including a challenge to the sufficiency of the evidence in Serrano's motion for a new trial after the jury's verdict. However, we deny relief.

Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus. Valle v. Moore, 837 So. 2d 905, 907 (Fla. 2002); Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000). The standard of review for claims of ineffective assistance of appellate counsel mirrors the Strickland standard for ineffective assistance of trial counsel. Valle, 837 So. 2d at 907. In order to grant habeas relief on ineffectiveness of appellate counsel, this Court must determine

> first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the

- 28 -

appellate process to such a degree as to undermine confidence in the correctness of the result.

Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986) (citing Johnson v. Wainwright, 463 So. 2d 207, 209 (Fla. 1985)).

Additionally, appellate counsel cannot be deemed ineffective for failing to raise meritless issues or issues that were not properly raised in the trial court and are not fundamental error. Valle, 837 So. 2d at 908. "In fact, appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; effective appellate counsel need not raise every conceivable nonfrivolous issue." Id. (citing Jones v. Barnes, 463 U.S. 745, 751-53 (1983); Provenzano v. Dugger, 561 So. 2d 541, 549 (Fla. 1990).

In Reed v. State, 875 So. 2d 415, 439 (Fla. 2004), this Court denied a similar habeas claim regarding trial counsel's alleged ineffectiveness for the failure to file a motion for new trial or other motion "challenging the legal sufficiency of the State's case." In Reed, this Court first explained that "[t]o the extent that Reed claims his trial counsel rendered ineffective assistance of counsel, this issue is improperly raised in a petition for writ of habeas corpus." Id. at 439-40. Then, this Court in Reed noted that "trial counsel moved for directed judgment of acquittal at the conclusion of the State's case-in-chief." Id. at 440. Finally, this Court in Reed explained that, because this Court found the evidence sufficient on

direct appeal, it would not have found any merit to a claim challenging sufficiency if one had been raised by appellate counsel.  Id.

Likewise, trial counsel here moved for a directed verdict after the State's case-in-chief, and, on direct appeal, this Court concluded that the circumstantial evidence was sufficient to support Serrano's four convictions for first-degree murder.  Serrano, 64 So. 3d at 104-05.  The end result of this Court's sufficiency analysis would not have been any different.  Accordingly, appellate counsel cannot be deemed ineffective for failing to raise this meritless issue.

## J. Polygraph Evidence

In his next habeas claim, Serrano asserts that appellate counsel was ineffective for failing to challenge the trial court's ruling regarding the admissibility of polygraph examinations.  Prior to trial, trial counsel moved to introduce evidence of polygraphs given to three State witnesses, namely Alvara Penaherrera, Gustavo Concha, and David Catalan.  After holding a hearing under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), the trial court denied the motion.

This Court has repeatedly explained that polygraph evidence is generally inadmissible in Florida.  See Duest v. State, 12 So. 3d 734, 746 (Fla. 2009); Walsh v. State, 418 So. 2d 1000, 1002 (Fla. 1982) ("[P]olygraph evidence is inadmissible in an adversary proceeding in this state.").  And, in Gosciminski v. State, 132 So.

3d 678, 701-04 (Fla. 2013), after reviewing the evidence presented at the <u>Frye</u> hearing, this Court affirmed the trial court's ruling that polygraphs are not generally accepted in the scientific community and are, therefore, inadmissible.

Accordingly, appellate counsel cannot be deemed deficient for failing to raise a meritless claim regarding the admissibility of polygraph evidence. We deny this habeas claim.

## K. Firearms

Serrano also alleges that appellate counsel was ineffective for failing to more directly argue on direct appeal that evidence of Serrano's gun collection was inadmissible at trial. However, because Serrano cannot demonstrate prejudice, we deny this habeas claim.

In the direct appeal, appellate counsel raised a variation of this claim, which this Court rejected. Specifically, as part of Serrano's claim that prosecutorial misconduct required reversal, appellate counsel alleged "that the State improperly elicited evidence that Serrano owned multiple guns for the purpose of implying that since Serrano owned a lot of guns, he must have been the killer in this case." <u>Serrano</u>, 64 So. 3d at 110. This Court explained that, "[a]lthough general ownership of guns does not provide evidence that one committed a murder, the evidence introduced in this case demonstrated that Serrano was familiar with and owned the caliber of firearms used to commit these murders." <u>Id</u>. at 110-11.

Importantly, this Court also stated that, "even if the admission of this gun evidence were considered error, the error would be harmless beyond a reasonable doubt." Id. at 111.

Because this Court determined that any error in admitting the gun evidence was harmless, Serrano cannot demonstrate prejudice under Strickland.  See Cox v. State, 966 So. 2d 337, 347 (2007) ("The harmless error test as articulated by this Court requires the State 'as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.'  State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).  Thus, in concluding that the prosecutor's misstatements of the law during voir dire constituted harmless error, we held that there was no reasonable probability that these misstatements contributed to Cox's conviction.  See id.  Therefore, regardless of whether counsel was deficient for failing to object to improper statements by the prosecution, Cox cannot demonstrate prejudice under the second prong of Strickland.").

Accordingly, we deny relief.

## L.  **Hurst**

Finally, we consider whether Serrano is entitled to relief after the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016).

Because the jury recommended the death penalty on all four counts by a vote of nine to three, we conclude that Serrano's death sentences violate Hurst. See Kopsho v. State, 209 So. 3d 568, 569-70 (Fla. 2017). We must then consider whether the Hurst error was harmless beyond a reasonable doubt:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

Hurst v. State, 202 So. 3d 40, 68 (Fla. 2016) (quoting DiGuilio, 491 So. 2d at 1138), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017).

Because the jury in this case recommended death on all four counts by a vote of nine to three, "we cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Kopsho, 209 So. 3d at 570. "We can only determine that the jury did not unanimously recommend . . . sentence[s] of death." Id. Therefore, because we cannot say that there is no possibility that the error did not contribute to the sentences, the error in Serrano's sentencing was not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentences and remand for a new penalty phase. See Hurst, 202 So. 3d at 69.

### III. CONCLUSION

For the foregoing reasons, we affirm the denial of Serrano's postconviction guilt phase claims, deny his habeas petition, vacate his death sentences, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur. POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentences pursuant to Hurst.

CANADY and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Polk County,
 Donald G. Jacobsen, Chief Judge - Case No. 532001CF003262A0XXXX
And an Original Proceeding – Habeas Corpus

Robert S. Friedman, Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida; and Louis G. Carres, Special Assistant Capital Collateral Regional Counsel, Northern Region, West Palm Beach, Florida,

 for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stephen D. Ake, Assistant Attorney General, Tampa, Florida,

 for Appellee/Respondent